**LOYOLA UNIVERSITY OF CHICAGO,**
Plaintiff–Appellee, Cross–Appellant,

v.

**Otis R. BOWEN, M.D., Secretary of the Department of Health and Human Services, Defendant–Appellant, Cross–Appellee.**

Nos. 88–3041, 88–3057.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 14, 1989.

Decided June 21, 1990.

James M. Gaynor, Jr., Stephen L. Tyma, McDermott, Will & Emery, Chicago, Ill., H. Guy Collier, McDermott, Will & Emery, Washington, D.C., for plaintiff-appellee, cross-appellant.

Linda A. Wawzenski, Asst. U.S. Atty., Chicago, Ill., Joel Tornari, Washington, D.C., for defendant-appellant, cross-appellee.

Before POSNER, COFFEY, and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

The Secretary of the United States Department of Health and Human Services ("Secretary," "HHS") appeals the district court's order granting summary judgment for the plaintiff-appellee, Loyola University of Chicago ("University"), on the issue of whether the Secretary improperly disallowed a portion of the University's claim for reimbursement of clinical medical education costs under the Medicare statute. *See* 42 U.S.C. § 1395 *et seq.* The University cross-appeals the district court's grant of summary judgment affirming the Secretary's denial of its claim for reimbursement of the costs of University-employed medical residents and interns working in the University's outpatient clinic. We affirm summary judgment for the University on the issue of reimbursement for clinical medical education costs and reverse summary judg-

ment for the Secretary on the issue of reimbursement for residents' and interns' costs.

## I.

Loyola University owns and operates the Foster G. McGaw Hospital ("Hospital"), the Burke Ambulatory Care Center ("BACC")[1] and the Stritch School of Medicine ("Medical School") as separate entities within the Loyola University Medical Center ("LUMC"), located in Maywood, Illinois.[2] The Hospital provides inpatient and emergency medical services whereas BACC is LUMC's outpatient clinic. LUMC's students, interns and resident physicians rotate through the various departments within the Hospital, as well as the BACC, in order to obtain the experience and training in patient care necessary for the Medical School's medical programs to receive accreditation from the American Medical Association. While working in either the Hospital or the BACC, students, interns and residents are supervised and trained by physicians on the Medical School faculty ("faculty-physicians"). Only Medical School faculty-physicians are allowed to practice medicine and treat patients in the Hospital and in the BACC. Similarly, faculty-physicians, in addition to their teaching and research duties at the Medical School, are required as a condition of their employment with LUMC to practice medicine primarily at the Loyola University Medical Center facilities and in other facilities only after having received approval in writing from the chairman of the department in which the faculty-physician practices and the dean of the Medical School.

Because LUMC's faculty-physicians engage in two distinct types of activities in the course of their employment—namely, providing teaching and research services to the Medical School and practicing medicine in the Hospital and in the BACC—they are compensated in two different ways. First, faculty-physicians receive a fixed salary from the Medical School for their teaching, research and administrative activities. Second, they receive a percentage of the revenue resulting from their own patient care activities in the LUMC facilities, determined pursuant to the terms of the Loyola Medical Practice Plan ("LMPP"), a faculty practice plan that all faculty-physicians are required to join as a condition of employment.

The University uses the LMPP as the vehicle for billing and collecting the fees for those receiving medical care and treatment in the LUMC facilities. Once a bill for medical services is generated, the LMPP apportions the revenue received between the University and the respective faculty-physicians on an agreed-upon contractual percentage basis. Specifically, after deducting the various administrative costs incurred from the patient's billing, LMPP reimburses the University twenty-one percent of the remainder "for use of practice-related facilities" and four percent for the "Dean's Development Fund." Faculty-physicians performing the services receive the remaining seventy-five percent of the fee until such time as they have reached their annual maximum patient care "earnings ceiling"[3] set forth in the LMPP. Thereafter, the faculty-physician receives only twenty-five percent of his patient care fees for the remainder of the fiscal year, with the remaining fifty percent being allocated to the "Research and Education" ("R & E") account of the particular Medical School department in which the faculty-physician is a faculty member.

The permissible uses for funds paid to R & E accounts is also set forth in the LMPP

---

1. BACC now operates under the name of Mulcahy Outpatient Clinic of Loyola University. However, because the facility has been referred to as the Burke Ambulatory Care Center throughout this litigation, we will refer to the clinic as such in this opinion.

2. The Marcilla Niehoff School of Nursing and Dental School are also entities within LUMC.

3. A faculty-physician's "earnings ceiling" is an amount negotiated between the medical doctor and the University. This figure is intended to discourage physicians from engaging in excessive patient care activities to the detriment of other LUMC responsibilities by significantly reducing the percentage of patient care billings distributed to the physician after the annual earnings ceiling is reached.

agreement. Paragraph 10.0 of the LMPP states that such funds may be used for medical education and research operating and capital costs, including faculty member base salaries, education or research personnel salaries, research and educational supplies or equipment, scientific exhibits, publications expenses, travel to professional meetings (within the constraints of the University's general travel policy and budget), fees and expenses of guest speakers, visiting professors and consultants, and renovation of space needed for education or research.

Under the Medicare statute,[4] the University is entitled to reimbursement for the reasonable costs [5] of medical services the Hospital provides to Medicare beneficiaries. 42 U.S.C. § 1395x(v)(1)(A). Under Medicare regulations, one of the costs which may be reimbursed is the cost of approved medical educational activities, including that portion of faculty salaries attributable to clinical education in the Hospital and stipends paid to medical residents and interns in accredited training programs. 42 C.F.R. § 405.421 (1982). Although the provider may include these expenses within its claim for reimbursement, reimbursement is available only for those costs net of "revenues it receives from tuition, and from grants and donations that the donor has designated for the activities." 42 C.F.R. § 405.421(g)(1) (1982).

In order for a provider of health care services to obtain reimbursement under Medicare, it must enter into a contract with the Secretary wherein the provider agrees to furnish medical services to Medicare beneficiaries and the Secretary agrees to reimburse the provider for the reasonable costs thereof. 42 U.S.C. § 1395cc. The provider nominates a fiscal intermediary, a private organization also under contract with the Secretary, and files an annual cost report with the intermediary setting forth all the reimbursable costs incurred during the fiscal year. 42 U.S.C. § 1395h; 42 C.F.R. § 413.60 (1982). As the agent of the Secretary, the intermediary reviews the provider's cost report and approves or disapproves payment for services rendered in compliance with the program's fee schedule, regulations and guidelines set forth in the manuals published by the Health Care Financing Administration ("HCFA"), the agency within HHS charged with administering the Medicare program. 42 U.S.C. §§ 1395g and 1395x(v)(1)(A).

Pursuant to its contract with the Secretary, the University filed cost reports with its designated intermediary, Blue Cross Association/Health Care Service Corporation (the "Intermediary"), for fiscal years 1979, 1980, 1981, 1982 and 1983. The University claimed reimbursement for its overall costs of clinical medical education, including salaries paid to medical residents and interns working in the LUMC facilities. The Intermediary disallowed reimbursement for fifty percent of the costs attributable to the time the residents and interns spent in BACC. The Intermediary also reduced the University's claimed overall clinical education costs by the amounts set aside under the LMPP for various R & E accounts in the Medical School. The Intermediary reasoned that these funds were restricted gifts and grants designated for payment of specific costs included within the University's reimbursement claim.

The University appealed the Intermediary's decision, referred to above, to the Provider Reimbursement Review Board ("PRRB"), a panel of five individuals appointed by the Secretary of HHS whose responsibilities include the mediating of

---

**4.** Although the University argues that it, rather than the Hospital, is the provider in this case, we reject this contention in light of 42 U.S.C. § 1395f(a), which narrowly defines the term "provider" as "a hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, a hospice program, or ... a fund."

**5.** The Medicare Act defines "reasonable cost" as

"the cost actually incurred, excluding therefrom any part of incurred costs found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types of classes of institutions, agencies and services...."

42 U.S.C. § 1395x(v)(1)(A).

"disputes between providers and intermediaries acting for [HHS]." *St. John's Hickey Memorial Hospital v. Califano*, 599 F.2d 803, 813 n. 18 (7th Cir.1979). The PRRB sustained the Intermediary on the issue of costs attributable to the time the LUMC resident physicians and interns spent in BACC, finding that the clinic "was a separate revenue producing cost center similar to private physicians' offices and was not a Medicare certified facility," and ruled that no portion of the BACC resident and intern costs was reimbursable. On the issue of offset, a majority of the PRRB reversed the Intermediary's adjustment to the University's claim for clinical education costs, finding that the adjustment contravened Congress' intent that "teaching hospitals and medical schools be able to derive a surplus from the patient care activities of faculty members." The PRRB chairman dissented, finding that the faculty-physicians granted a portion of their professional fee earnings to the University to be used for purposes specified in the LMMP document, and thus, the provider (the Hospital) was essentially claiming Medicare reimbursement for the same costs. The chairman also asserted that the provider had failed to support its claim that Congress intended that teaching hospitals be allowed to derive a profit from patient care services, thus concluding that the contributed amounts had to be charged against the cost of the claimed educational activities pursuant to 42 C.F.R. § 405.421 (1982) and 42 C.F.R. § 405.423 (1982).

The Deputy Administrator of HCFA elected to review the PRRB's decision, sustaining without comment the Board's decision on the resident and intern stipend issue and reversing the majority's conclusion on the issue of offset. In an opinion dated July 15, 1986, the Deputy Administrator agreed with the dissenting PRRB chairman that the funds generated by the faculty-physicians and distributed to the R & E accounts were restricted gifts and grants and were properly offset against the claimed educational expenses in order that they might be able to more properly determine an accurate "net cost" of the Hospital's educational activities. The administrator's decision constitutes the final decision of the Secretary of HHS. 42 U.S.C. § 1395*oo* (f)(1); 42 C.F.R. § 405.1875 (1982); 42 Fed.Reg. 13,062, 57,351 (1977).

On January 21, 1987, the University filed a complaint in the district court seeking judicial review of the Secretary's final decision pursuant to 42 U.S.C. § 1395*oo* (f)(1). Both parties submitted motions for summary judgment and accompanying briefs. In its brief, the University set forth its contentions that the LMPP funds were neither gifts nor grants and that, even if they were, they were not restricted gifts or grants within the meaning of 42 C.F.R. § 405.423 (1982). With regard to its claim for the costs of residents and interns attributable to patient care performed in the BACC, the University argued that since the clinic was "part of the provider" (the Hospital), it was entitled to reimbursement for the costs of residents and interns working at the BACC.

The Secretary argued that, because Medicare is required to reimburse only a provider's net operating costs, the funds allocated to the R & E accounts must be considered in determining the University's net costs of teaching salaries paid to Medical School faculty members. The Secretary also argued that the funds transferred from the LMPP to the R & E accounts were restricted grants subject to offset pursuant to 42 C.F.R. § 405.423. On the second issue, the Secretary argued that the final agency decision denying reimbursement for the costs of residents serving in the BACC was justified because the clinic was neither a physical nor administrative part of the Hospital and, therefore, that portion of resident and intern stipends attributable to BACC was not reimbursable under Medicare Part A.[6]

---

**6.** The Medicare program is divided into two parts. Part A provides for reimbursement of inpatient hospital services at the lesser of the provider's reasonable costs of rendering such services or its customary charges for such services. 42 U.S.C. §§ 1395c–1395i–2. Part B of the Medicare program pays for various health services not covered by Part A, including physician and various hospital outpatient services. 42 U.S.C. §§ 1395j–1395w. Reimbursement to

The district court referred the case to a magistrate, directing that he analyze and prepare a report and recommendation on the parties' summary judgment motions. On October 28, 1987, the magistrate submitted his report, finding that the LMPP funds allocated to the Medical School's R & E accounts were "not restricted by the physician-faculty member donors" and, therefore, were not "restricted grants, gifts, and endowment income under the regulations." The magistrate thus concluded that the Secretary improperly adjusted the University's claim for reimbursement of clinical medical education costs and recommended that the Secretary's motion for summary judgment on this issue be denied and the plaintiffs' motion for summary judgment be granted. Regarding the issue of resident and intern costs related to the BACC, the magistrate concluded that, because the BACC was neither a physical nor an administrative part of the Hospital, the University could not be reimbursed for costs associated with that entity. Accordingly, the magistrate recommended that Loyola's motion for summary judgment on this issue be denied and the Secretary's motion for summary judgment be granted.

On November 13, 1987, the district court adopted the report and recommendation of the magistrate and entered summary judgment for the University on the issue of offset and summary judgment for the Secretary on the issue of resident and intern costs attributable to BACC. After overruling the University's post-judgment objections to the magistrate's recommendations, the court entered a final judgment on August 17, 1988.

On appeal, the Secretary argues that the trial court erred in reversing the Secretary's decision to reduce the University's claimed clinical medical education costs, maintaining that the amount set aside for research and education under the LMPP should be construed as restricted gifts and grants under 42 C.F.R. § 405.423 (1982). According to the Secretary, the court's

grant of summary judgment for the University allows the Hospital to be reimbursed for expenses, e.g., various research and education costs, that were covered by the amounts allocated to such accounts under the LMPP, thus violating the "net cost" principle of 42 U.S.C. § 1395x(v)(1)(A).

The University, although agreeing with the magistrate's conclusion that the R & E funds were not restricted to payment of specific operating costs as designated by the donor of the funds, argues that the magistrate unnecessarily addressed the issue of whether the funds were restricted because the funds were neither gifts nor grants within the parameters of the Medicare regulations. In its cross-appeal, the University argues that the district court erred in granting summary judgment for the Secretary on the issue of the resident and intern costs attributable to the BACC. Specifically, the University contends that the BACC is "part of the provider,"[7] thus mandating reimbursement for the portion of LUMC resident and intern stipends attributable to time spent therein, and that the Secretary's denial of reimbursement would cause the cost of resident and intern services provided to Medicare beneficiaries in the BACC to be borne entirely by non-Medicare patients, which is expressly prohibited under 42 U.S.C. § 1395x(v)(1)(A).

## II.

At the outset, we note that our standard of review in this case is limited. 42 U.S.C. § 1395oo (f)(1) limits review of the Secretary's final decision on reimbursement matters by incorporating the standards of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* Under the APA, the "Secretary's decision may not be disturbed ... unless it is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law; contrary to constitutional right, power, privilege or immunity; exceeding statutory jurisdiction, or falling short of statutory right; reached in violation of established

---

physicians is on a fee-for-service basis and reimbursement for hospital outpatient services is 80 percent of the lesser of reasonable costs or reasonable charges.

7. *See* discussion of HCFA Carriers Manual § 2020.8 in Section IV, *infra.*

procedure; or unsupported by substantial evidence." *Daviess County Hospital v. Bowen,* 811 F.2d 338, 343 (7th Cir.1987); *Bedford Medical Center v. Heckler,* 766 F.2d 321, 323 (7th Cir.1985); *St. Francis Hospital Center v. Heckler,* 714 F.2d 872, 873–74 (7th Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

Moreover, it is well established that "[t]he Secretary's interpretation of regulations issued pursuant to the complex and reticulated Medicare Act is entitled to considerable deference." *Adventist Living Centers, Inc. v. Bowen,* 881 F.2d 1417, 1420–21 (7th Cir.1989); *Homemakers North Shore, Inc. v. Bowen,* 832 F.2d 408, 411 (7th Cir.1987); *Lauer v. Bowen,* 818 F.2d 636, 639 (7th Cir.1987); *Bedford,* 766 F.2d at 323. However, this "does not ... shield [the Secretary's decision] from a 'thorough, probing, in-depth review.'" *Memorial Hospital of Carbondale v. Heckler,* 760 F.2d 771, 773 (7th Cir.1985) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). In addition, "a lesser degree of deference is required when reviewing a Secretary's actions under the Medicare Act's reimbursement provisions.... The regulations promulgated under the Medicare Act *'must ...* take into account both direct and indirect costs and *must* avoid the result of shifting costs to non-Medicare patients.'" *St. James Hospital v. Heckler,* 760 F.2d 1460, 1470 (7th Cir.1985) (quoting *St. John's Hickey Memorial Hospital v. Califano,* 599 F.2d 803, 813 n. 17 (7th Cir.1979)) (emphasis in *St. James* ). With these standards in mind, we turn to the merits of the parties' arguments.

### III.

The first issue presented for our review is whether the Secretary's decision to offset the Hospital's claim for reimbursement of clinical education costs by the amount of faculty-physician patient care revenues allocated to the Medical School's R & E accounts can be classified as arbitrary, capricious, or an abuse of discretion or is not supported by substantial evidence. Specifically, the Secretary determined that the funds allocated to the R & E accounts were "gifts and grants restricted for a specified purpose," thus requiring a reduction in the Hospital's claim for reimbursement under Medicare's "net cost" principle. *See* 42 C.F.R. § 405.421(a) & (g) (1982).[8]

The rule allowing offset for "restricted gifts and grants" is codified at 42 C.F.R. § 405.423 (1982),[9] which provides:

"(a) *Principle.* Unrestricted grants, gifts, and income from endowments should not be deducted from operating costs in computing reimbursable costs. Grants, gifts or endowment income designated by a donor for paying specific operating costs should be deducted from the particular operating costs and group of costs.

(b) *Definitions* —(1) *Unrestricted Grants, Gifts, Income from Endowment.* Unrestricted grants, gifts and income from endowments are funds, cash or otherwise, given to a provider without restriction by the donor as to their use.

(2) *Designated or Restricted Grants, Gifts and Income from Endowments.* Designated or restricted grants, gifts, and income from endowments are funds, cash or otherwise, which must be used

---

**8.** 42 C.F.R. § 405.421 has been amended and recodified as 42 C.F.R. § 413.85. *See* 48 Fed. Reg. 39,752 (1983); 49 Fed.Reg. 234 (1984); 50 Fed.Reg. 27,722 (1985); 51 Fed.Reg. 34,790 (1986); and 54 Fed.Reg. 40,286 (1989).

**9.** 42 C.F.R. § 405.423 was repealed in 1983 after Congress, in 1980, amended the Medicare Act to prohibit the Secretary from deducting from a hospital's claimed operating costs "[a] grant, gift, or endowment, or income therefrom,

which is to or for such a hospital and which has not been designated by the donor for paying any specific operating costs," 42 U.S.C. § 1320b–4(1), and "[t]hose types of donor designated grants and gifts ..., and income therefrom, which the Secretary determines, in the best interest of needed health care, should be encouraged." *Id.* § 1320b–4(3). *See* 48 Fed. Reg. 39,752 (1983); 49 Fed.Reg. 234,296 (1984).

only for the specific purpose designated by the donor. This does not refer to unrestricted grants, gifts, or income from endowments which have been restricted for a specific purpose by the provider.

(c) *Application.* (1) Unrestricted funds, cash or otherwise, are generally the property of the provider to be used in any manner its management deems appropriate and should not be deducted from operating costs. It would be inequitable to require providers to use the unrestricted funds to reduce the payments for care. The use of these funds is generally a means of recovering costs which are not otherwise recoverable.

(2) Donor-restricted funds which are designated for paying certain hospital operating expenses should apply and serve to reduce these costs or group of costs and benefit all patients who use services covered by the donation. If such costs are not reduced, the provider would secure reimbursement for the same expense twice: it would be reimbursed through the donor-restricted contributions as well as from patients and third-party payers including the Title XVIII health insurance program."

The rationale behind this rule is "[t]o prevent what would be in effect double reimbursement of [the provider's] costs...." *Heckler v. Community Health Services,* 467 U.S. 51, 55, 104 S.Ct. 2218, 2221, 81 L.Ed.2d 42 (1984). However, a reduction of a provider's claimed costs under section 405.423 is appropriate only when the three requirements of the regulation are satisfied. Specifically, the funds subject to offset must (1) qualify as "grants, gifts or income from endowments"; (2) be designated for paying specific operating expenses of the hospital; and (3) be restricted for such purposes by the donor of the funds. As noted above, the magistrate found that offset was inappropriate in this case because the restrictions placed on the funds allocated to the R & E accounts were restricted by the LMPP agreement rather than the LUMC faculty-physicians individually, the donors of these funds. This finding was adopted by the district court in

granting summary judgment for the University on this issue. We agree with the magistrate's decision that these funds were not donor-restricted. Moreover, from our review of the record we conclude that the funds were not "grants, gifts or income from endowments" under the Medicare statute nor were they designated for paying specific Hospital operating costs.

■ Since neither the Medicare statute nor regulations define "grants, gifts and income from endowments," the Secretary contends that the R & E funds are grants, and the University has, conversely, presented extensive arguments under Illinois gift law. However, we conclude, as did the magistrate, that the regulation uses the terms "grant," "gift," and "endowment income" in combination to categorize funds or income-producing property donated to the provider in broad, rather than specific, terms. *See Milford Memorial Hospital, Inc. v. United States,* 675 F.2d 270, 272, 230 Ct.Cl. 76 (1982); *Carbondale,* 760 F.2d at 773. The Secretary's reasoning and conclusion that the R & E funds can be classified as "grants, gifts or endowment income" are premised largely on the fact that these funds were derived from the faculty-physicians' patient care billings. Although this fact is beyond dispute, it is not dispositive of the primary question of whether the funds are "gifts and grants" under section 405.423. The Secretary's specific argument is that "the faculty-physicians have agreed to transfer funds generated by their services, funds to which they were otherwise entitled, to the University as consideration for employment with the University." As an initial matter, we note that the Secretary has failed to explain how the LUMC faculty-physicians were "otherwise entitled" to the funds transferred to the R & E accounts. Regardless, this contention is belied by the LMPP document itself.

As noted above, LUMC faculty-physicians, as separate entities, do not bill on their own behalf for the medical services they generate and/or perform. Rather, the LMPP does the billing for all patient care and services rendered in the LUMC facilities and collects the revenues derived

therefrom, either from the patients themselves or from third-party payors such as private insurers and Medicare. Thus, patient care revenues are paid directly to the LMPP, not to the individual faculty-physicians, and the revenues are distributed according to the formula set forth in the LMPP agreement. The agreement specifies the percentage of patient care billings to which the faculty-physicians are entitled; the remainder, including the funds ultimately distributed to the R & E accounts, is the property of the University.

Even assuming *arguendo* that the faculty-physicians were "otherwise entitled" to the R & E funds, which they were not, the Secretary's argument is without support in the record. Essentially, the Secretary is arguing that the R & E funds are gifts and grants from the faculty-physicians because they have, by virtue of signing the LMPP agreement, made an assignment of future income to the University. However, the Secretary's argument ignores the fact that if the distribution formula set forth in the LMPP document were an actual assignment of income, the funds allocated to the R & E accounts would constitute taxable income for the faculty-physicians, despite the fact that they never received these funds. *See In re Kochell*, 804 F.2d 84, 85 (7th Cir.1986) ("[I]n tax law a payment attributable to a person's earnings that bypasses him and goes to his designees is taxed as a payment to him."); *accord In re Larson*, 862 F.2d 112, 116 (7th Cir.1988). The University, in reporting the faculty-physicians' patient care income for federal income tax purposes, reports that portion of the patient care revenues actually received by each faculty-physician. Patient care revenues attributable to that individual but distributed to the R & E accounts are not reported on the physician's earnings statement (IRS Form 1099). Consequently, LUMC faculty-physicians do not report these revenues as income, nor do they claim charitable deductions for the amounts they supposedly donate to the University. *Compare* Rev.Rul. 70–161, 1970–1 C.B. 15; Rev.Rul. 69–275, 1969–1 C.B. 36; Rev.Rul. 66–377, 1966–2 C.B. 21. The record reflects that Internal Revenue Service audits of the University have not resulted in objections to this reporting practice. Thus, we reject the Secretary's contention that the faculty-physicians granted a portion of their future income to the University. On the contrary, the fee distribution formula set forth in the LMPP agreement is more appropriately characterized as merely implementing the University's policy of permitting physicians to retain a portion of their patient care billings as income. Thus, the funds allocated to the medical school R & E accounts cannot, in our opinion, be considered "grants, gifts or endowment income" as that phrase is used in the Medicare regulations. The Secretary's finding to the contrary is not supported by substantial evidence in the record.

■ The Secretary's finding that the funds were designated for paying specific operating costs of the Hospital is also without support in the record. In reaching the determination that offset was appropriate under 42 C.F.R. § 405.423 (1982), the Secretary merely found that "the funds were clearly restricted because they were designated specifically for research and education in the [LMPP] document." The record before us is devoid of any finding stating that the restrictions the LMPP document placed on the funds were limited to specific operating costs of the Hospital, nor from our reading of the record could such a finding be made. In his brief, the Secretary himself admits that only "some of these purposes, such as the salaries of faculty members, are specific operating costs which are claimed by the provider...." Further, paragraph 10.0 of the LMPP document explicitly provides that the R & E "funds are available for the following purposes *at the discretion of the chairman of the individual departments* with the approval of the Dean" and goes on to list the costs, operating and otherwise, to which the funds may be applied. (Emphasis added). In other words, the medical school's department heads had discretion to apply the R & E funds for any purpose listed in the document, whether it was a specific operating cost or another, more general

category of expense incurred by the Hospital. Thus, we conclude that the R & E funds are not restricted to paying specific operating costs of the Hospital. The fact that the funds may, in some instances, be applied to defray some of the Hospital's operating expenses is irrelevant. *See Milford Memorial Hospital, Inc., supra; Board of Trustees of the University of Alabama v. Califano,* [1979–1 Transfer Binder] **Medicare & Medicaid Guide (CCH)** ¶ 29,251 (N.D.Ala. August 11, 1978); *Memorial Hospital v. Blue Cross and Blue Shield Association/Blue Cross of Rhode Island,* PRRB Dec. No. 84–D2 [1984–1 Transfer Binder] **Medicare & Medicaid Guide (CCH)** ¶ 33,568 (October 7, 1983); *Newton–Wellesley Hospital v. Aetna Life & Casualty,* PRRB Dec. No. 78–D76, [1979–1 Transfer Binder] **Medicare & Medicaid Guide (CCH)** ¶ 29,491 (November 13, 1978).

 Finally, we agree with the magistrate that the funds allocated to the R & E accounts were restricted by the LMPP agreement rather than any action on the part of the LUMC faculty-physicians individually.[10] The restrictions are contained in the LMPP agreement, which the physicians are required to sign as a condition of their employment, and the LMPP derives its authority over the R & E funds from the University. The Secretary argues that the faculty-physicians "ratified" the restrictions with their signing of the LMPP agreement and, further, that the faculty-physicians had ample opportunity to examine and express their disagreement with the restrictions before signing the LMPP agreement. We disagree with this argument because it is based on mere speculation and conjecture and ignores the fact that the only term in the LMPP agreement (which deals exclusively with patient care billing) which individual physicians can negotiate with the University is the amount of their annual earnings ceiling.[11] We also

note that the Secretary's arguments that the R & E funds were donor-restricted are improper *post hoc* rationalizations attempting to justify the Secretary's offset decision. In his decision, the Secretary for some unknown reason failed to address whether the restrictions on the LMPP funds were imposed by the faculty-physicians, whom it found to be the grantors of the funds, a necessary finding under section 405.423. Thus, under basic principles of administrative law, we cannot accept the Secretary's *post hoc* arguments on appeal. As the Supreme Court has stated:

> " '[A] simple but fundamental rule of administrative law ... is ... that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such actions solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action.' "

*Burlington Truck Lines Inc. v. United States,* 371 U.S. 156, 169, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962) (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)). *See also Beloit Corp., Castings Div. v. NLRB,* 857 F.2d 1154, 1159 (7th Cir.1988).

Accordingly, we hold that the Secretary's decision to offset the University's claim for reimbursement of clinical medical education costs by an amount equal to the funds allocated to the R & E account is not supported by substantial evidence in the record. Our review of the record reveals that none of the requirements for offset under 42 C.F.R. § 405.423 (1982) are satisfied in this case. We are convinced that the trial court properly granted summary judgment in favor of the University on this issue.

## IV.

We next consider whether the Secretary's denial of the University's claim for

---

**10.** Implicit within our holding, *supra,* that the faculty-physicians did not make an assign·ıent of future income to the University is a determination that the physicians are not "donors" of the funds. However, for purposes of analyzing whether the funds were donor-restricted, we

will assume *arguendo,* as did the magistrate, that the physicians donated the funds to the University.

**11.** *See supra* note 3.

reimbursement of the portion of stipends paid to LUMC resident physicians and interns attributable to the time they spent in the BACC was proper. As noted above, the Secretary denied reimbursement of these costs based on his finding that the BACC is not "part of the provider" and, thus, that the provider, the Hospital in this case,[12] is not entitled to reimbursement for resident and intern costs associated with the operation of the BACC. The magistrate found that the Secretary's determination that the BACC is not "part of the provider" was supported by substantial evidence, and the district court adopted this finding in granting summary judgment for the Secretary on this issue.

■ The University argues that the Secretary is not entitled to summary judgment because the language of the applicable Medicare regulations does not support his contention that, in order for the costs of the provider's educational activities to be reimbursable, the activities must occur in a facility which is "part of the provider." In defending his "part of the provider" rationale, the Secretary refers us to section 2020.8 of the HCFA Carriers Manual, which provides in part:

> "There are situations where interns and residents render services in a facility (which for purposes of this paragraph includes clinics, physicians' offices, and other patient care centers) to fulfill training program requirements. Where the facility is part of a provider, reimbursement is made on a reasonable cost basis [i.e., under Medicare Part A]. Conversely, if the facility is not part of the provider, the services of the interns and residents are covered as physicians' services reimbursable on a reasonable charge basis [i.e., under Medicare Part B]...."

The Secretary urges us to adopt section 2020.8's "part of the provider" requirement which is, essentially, his interpretation of the regulations promulgated under the Medicare Act.

Although the Secretary's interpretation of his own regulations is usually accorded substantial deference, *see supra*, section II., such deference is appropriate only if the Secretary's interpretation of the regulations is consistent with the language of the regulations themselves. *See Ensinger v. Director, OWCP*, 833 F.2d 678, 679 (1987). The regulation governing reimbursement of the Hospital's educational expenses in this case is codified at 42 C.F.R. § 405.421 (1982), which provides in pertinent part:

> "(a) A provider's allowable costs may include its net cost of approved educational activities....
>
> (b) *Definition—Approved Educational Activities.* Approved educational activities means formally organized or planned programs of study usually engaged by providers in order to enhance the quality of patient care in an institution. These activities must be licensed where required by State law. Where licensing is not required, the institution must receive approval from the recognized national professional organization for the particular activity.
>
> (c) *Educational Activities.* Many providers engage in educational activities including training programs for nurses, medical students, interns and residents, and various paramedical specialties. These programs contribute to the quality of patient care within an institution and are necessary to meet the community's needs for medical and paramedical personnel. It is recognized that the costs of such educational activities should be borne by the community. However, many communities have not assumed responsibility for financing these programs and it is necessary that support be provided by those purchasing health care. Until communities undertake to bear these costs, the program will participate appropriately in the support of these activities. Although the intent of the program is to share in the support of educational activities customarily or tradi-

---

12. As we stated in note 4, *supra*, the Hospital, not the University, is the provider of services

under 42 U.S.C. § 1395f(a).

tionally carried on by providers in conjunction with their operations, it is not intended that this program should participate in increased costs resulting from redistribution of costs from educational institutions or units to patient care institutions or units.

\* \* \* \* \* \*

(e) *Approved Programs.* [This subsection refers to residency programs approved by the American Medical Association's Council on Medical Education]."

From our reading of this regulation, we are unable to find within the above language a requirement that educational activities occur in the provider or a facility that is "part of the provider" in order for the activities to be deemed reimbursable under Medicare. Thus, because the Secretary's "part of the provider" requirement is not contained in the regulations—regulations which the Secretary promulgated—we refuse to defer to the Secretary's interpretation of the regulations in the HCFA Carriers Manual, *see Community Hospital of Indianapolis, Inc. v. Schweiker,* 717 F.2d 372, 375 (7th Cir.1983), and reject his interpretation that educational activities must occur in a facility that is "part of the provider" to qualify for Medicare reimbursement.[13] Rather, we agree with the Sixth Circuit that "to be reimbursable under the plain language of [42 C.F.R. § 405.421 (1982)], educational activities must (1) be approved programs; (2) contribute to the quality of patient care within an institution; and (3) not redistribute costs from educational to patient care institutions." *University of Cincinnati v. Bowen,* 875 F.2d 1207, 1210 (6th Cir. 1989).[14] Thus, we must analyze the University's claim for reimbursement in order to determine whether these criteria are satisfied.

■ There is no dispute that the University satisfies requirement number one— namely, that the educational activities are part of an approved program. The University's residency program is accredited by the Liaison Committee on Graduate Medical Education of the American Medical Association, one of the criteria being that residents and interns receive outpatient diagnostic and treatment training and experience. LUMC residents and interns, as part of their training, rotate through the BACC, as well as various departments within the Hospital, to fulfill the AMA's accreditation requirements.

With regard to the requirement that the University's residency and intern program contribute to the quality of patient care within the Hospital, we again agree with the rationale of the *University of Cincinnati* case, which also involved the question of whether resident costs attributable to time spent in outpatient clinics were reimbursable under Medicare. As the Sixth Circuit aptly stated:

"Given that the outpatient clinic programs are accredited programs required as part of the residents' training, they *ipso facto* contribute to the quality of care received by the Hospital's Medicare patients. The skills and training received by the residents in the clinics are transferred back to the Medicare patients during the residents' rotation within the Hospital."

875 F.2d at 1211. This statement is equally applicable to the facts of this case given the relationship between the Hospital and the BACC. Patients examined and diag-

---

**13.** Because we reject the Secretary's interpretation that educational activities must occur in a facility that is "part of the provider," we need not determine whether the Secretary's determination that the BACC is not "part of" the Hospital is supported by substantial evidence.

**14.** We note that the trial court did not have the benefit of the Sixth Circuit's decision in *University of Cincinnati* as that case had not been decided at the time of its ruling on the parties' summary judgment motions. We also note that Congress, in the Omnibus Budget Reconciliation

Act of 1986, Pub.L. No. 99–509, Title IX, § 9314, 100 Stat. 1874, 2005 (1986) amended the Medicare Act to provide that, effective July 1, 1987,

"time spent in activities relating to patient care shall be counted and that all the time so spent by a resident under an approved medical residency training program shall be counted ... without regard to the setting in which the activities are performed, if the hospital incurs all, or substantially all, of the costs for the training program in that setting."

*See* 42 U.S.C. § 1395ww(h)(4).

nosed at the BACC are frequently admitted to the Hospital to receive the prescribed treatment and any further diagnostic workup indicated on an inpatient basis. Similarly, discharged Hospital patients requiring followup care receive it at the BACC. Thus, the residents and interns, under the continued supervision of the faculty-physicians, are exposed to and trained in all aspects of patient care and the training they receive in the BACC unquestionably contributes to and enhances the quality of patient care in the Hospital. Thus, we conclude that the second requirement of section 405.421(c) is likewise satisfied.

Finally, from our review of the record, we are of the opinion that there is no impermissible shifting of costs from educational to patient care institutions. The Hospital seeks reimbursement only for the residents' patient care activities involving Medicare beneficiaries, and the Secretary does not argue that the Hospital has included any inappropriate educational expenses within its claim. Thus, we conclude that the costs of resident and intern training in the Hospital and the BACC are properly shifted to the patient care institution and its Medicare beneficiaries. Moreover, to disallow these costs would cause the cost of providing services to Medicare beneficiaries to be shifted to other patients within the Hospital and the BACC. We will not be a party to allowing the Secretary to violate the specific and clear congressional intent expressed in 42 U.S.C. § 1395x(v)(1)(A) that "the necessary costs of efficiently delivering covered services to individuals covered by the [Medicare] insurance programs ... will not be borne by individuals not so covered." *See St. John's Hickey Memorial Hospital, supra,* 599 F.2d at 812.

Having determined that the University's claimed costs associated with its residency and intern programs comport with the requirements of 42 C.F.R. § 405.421 (1982), we hold that the Secretary's denial of reimbursement for that portion of LUMC resident and intern costs attributable to time spent in the BACC was arbitrary and capricious. Thus, we hold that the district court erred in granting summary judgment for the Secretary on this issue.

## V.

For the foregoing reasons, we affirm the district court's grant of summary judgment for the University on the issue of offset and reverse the court's grant of summary judgment for the Secretary on the issue of resident costs.

AFFIRMED IN PART; REVERSED IN PART.