RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0194p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BRECKINRIDGE HEALTH, INC., et al.

     *Plaintiffs-Appellants*,

  *v.*

THOMAS E. PRICE, in his official capacity as Secretary of the United States Department of Health and Human Services,

     *Defendant-Appellee*.

No. 16-6269

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:15-cv-00251—Joseph H. McKinley Jr., Chief District Judge.

Argued: April 27, 2017

Decided and Filed: August 23, 2017

Before: GUY, SILER, and DONALD, Circuit Judges.

---

## COUNSEL

**ARGUED:** David M. Dirr, DRESSMAN BENZINGER LAVELLE PS, Crestview Hills, Kentucky, for Appellants. Carleen M. Zubrzycki, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** David M. Dirr, Mathew R. Klein, Richard G. Meyer, DRESSMAN BENZINGER LAVELLE PS, Crestview Hills, Kentucky, for Appellants. Carleen M. Zubrzycki, Michael S. Raab, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

**AMENDED OPINION**

---

BERNICE BOUIE DONALD, Circuit Judge.  Various Kentucky hospitals (collectively, "Appellants") sought Medicare reimbursement for certain state taxes they paid on their gross revenue.  The United States Department of Health and Human Services ("HHS") offset the amount of Appellants' Medicare reimbursement by the Medicaid Disproportionate Share Hospital ("DSH") payments Appellants received, reasoning that those payments effectively refunded the taxes paid.  The district court affirmed this decision.  Because the net effect of the Medicaid DSH payment was to reimburse Appellants for the tax, HHS's decision was not arbitrary, capricious, or manifestly contrary to the Medicare statute.  Accordingly, we **AFFIRM** the district court's judgment.

I.

Appellants are Critical Access Hospitals and are reimbursed by Medicare for the reasonable and necessary costs of providing services to Medicare patients.  The federal Medicaid program requires states to create a plan to provide additional payments to hospitals, like Appellants, that serve a disproportionate share of low-income patients.  42 U.S.C. § 1396a(a)(13)(A)(iv).  In Kentucky, these DSH payments are matched at 70% by the federal government.  Kentucky's contribution to DSH programs comes from two sources: Kentucky Provider Tax Revenue ("KP-Tax") and payments from state university hospitals.  The KP-Tax is a 2.5% tax on the gross revenue of various hospitals, including Appellants.  Ky. Rev. Stat. § 142.303(1).  The KP-Tax revenue is deposited into the Medical Assistance Revolving Trust ("MART"), Ky. Rev. Stat. § 205.640(2), which in turn is used to fund the DSH payments, Ky. Rev. Stat. § 205.640(3)(a).  The amount of DSH payments a hospital receives is unrelated to the amount of KP-Tax it paid.  Also, during the years at issue, DSH payments covered only approximately 45% of the costs Appellants incurred providing care to indigent patients.

Appellants filed cost reports in 2009 and 2010 claiming their entire KP-Tax payment as a reasonable cost for reimbursement under the Medicare Act.  Up until that point, they had

received full reimbursement under the reasonable cost statute. However, for 2009 and 2010, the Medicare Administrative Contractor denied full reimbursement, offsetting the KP-Tax cost by the amount of Medicaid DSH payments Appellants received. The Provider Reimbursement Review Board ("PRRB") upheld the offsets, concluding that when Appellants received a Kentucky Medicaid DSH payment, they were actually receiving a refund of some or all of the KP-Tax they paid. So it concluded that the reimbursable Medicare cost "actually incurred" was the gross amount Appellants paid for the KP-Tax, minus the Medicaid DSH payments it received.

Appellants appealed this decision, but the Administrator of the Centers for Medicare and Medicaid Services issued a final decision declining to modify the PRRB's decision. Appellants then filed the instant action, asserting violations of the Administrative Procedure Act. The parties filed cross-motions for summary judgment.

The district court upheld the offset decision. Relying heavily on *Abraham Lincoln Memorial Hospital v. Sebelius*, 698 F.3d 536 (7th Cir. 2012), the district court agreed with the PRRB that the net economic impact of Appellants' receipt of the DSH payment in relation to the cost associated with the KP-Tax assessment indicated that the DSH payments served to reduce Appellants' expenses such that they constituted a refund. So, the district court concluded that the KP-Tax payment was properly offset by the DSH payment. Next, the district court rejected Appellants' argument that the PRRB's decision was inconsistent with the Final Rule of August 16, 2010, which, according to Appellants, requires a payment to be made specifically for the purpose of reimbursing a tax in order for the claimed reimbursement to be offset by the payment. The district court concluded that the Rule merely requires evidence that the DSH payment and the KP-Tax are related prior to offsetting the KP-Tax by the DSH payment. Finally, the district court rejected Appellants' argument that the offset decision deviated from longstanding practice, reasoning that an agency does not establish policy simply by not taking administrative action.[1]

---

[1]Appellants have not raised this argument on appeal, so we decline to consider it. *See Shirvell v. Gordon*, 602 F. App'x 601, 606 (6th Cir. 2015).

II.

Where, as here, Congress left it up to HHS to determine what constitutes a reasonable cost meriting reimbursement, we give its judgment controlling weight unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984). Our inquiry is not whether the HHS's interpretation is the best one; instead, we give substantial deference to its interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)). In the Medicare context, "broad deference is all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Atrium Med. Ctr. v. HHS*, 766 F.3d 560, 568 (6th Cir. 2014) (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512) (internal quotation marks omitted).

III.

a.

Under the Medi*caid* program, a state plan must provide that payments made to hospitals include an upward rate adjustment for hospitals that serve a disproportionate number of low-income patients that have special needs. 42 U.S.C. § 1396a(a)(13)(A)(iv); *Owensboro Health, Inc. v. HHS*, 832 F.3d 615, 618 (6th Cir. 2016). The purpose of this adjustment is to give relief to those hospitals that have few privately insured patients to counteract the losses incurred from a large volume of uninsured patients. *Owensboro Health*, 832 F.3d at 618–19 (quoting H.R. Rep. No. 103-111, at 211 (1993)). In Kentucky, this upward adjustment, or DSH payment, is determined by regulation. 907 KAR 10:820 § 4.

Under Kentucky law, providers are also required to pay a 2.5% tax on gross revenues. Ky. Rev. Stat. § 142.303(1). The provider taxes, or KP-Tax assessment payments, are deposited into the MART fund. Ky. Rev. Stat. § 205.640(2). These "provider tax revenues and state and

federal matching funds shall be used to fund the disproportionate share program." Ky. Rev. Stat. § 205.640(3)(a).

b.

A hospital may also enter into an agreement with the Secretary to render services to Medi*care* patients, in most circumstances without charge, in return for payments made by Medicare. 42 U.S.C. § 1395cc(a). To be reimbursed by Medicare, hospitals must provide adequate data, based on financial and statistical records, of the costs they incurred. 42 C.F.R. § 413.24(a). Medicare will then reimburse the hospital based on a method of apportioning the costs it will bear. 42 C.F.R. § 413.50(a). Hospitals providing services to Medicare patients are reimbursed for the reasonable costs of providing care to those beneficiaries. 42 U.S.C. § 1395x(v); 42 C.F.R. § 413.9(a). Which of the reasonable costs are "actually incurred" by a provider is determined by regulation, 42 U.S.C. § 1395x(v)(1)(A), and the Secretary has broad discretion to determine the reasonable costs that may be reimbursed, *Battle Creek Health Sys. v. Leavitt*, 498 F.3d 401, 410 (6th Cir. 2007). The regulations define reasonable costs to include direct and indirect costs of providing services. 42 C.F.R. § 413.9(b)(1). In short, the goal of this reimbursement scheme is to prevent covered individuals from bearing the costs of services, while ensuring that the Secretary does not bear the costs for non-covered patients. 42 C.F.R. § 413.9(b)(1).

Retroactive adjustments to the Medicare reimbursement amount are appropriate where the amount is deemed either inadequate or excessive. 42 U.S.C. § 1395x(v)(1)(A). To this end, the regulations provide that refunds—"amounts paid back or a credit allowed on account of an overcollection"—reduce the reimbursement amount. 42 C.F.R. § 413.98(b)(3). Refunds are "clearly reductions in costs," so must be taken into account in determining the "true cost" of services, or the "net amount actually paid for them." 42 C.F.R. § 413.98(d).

c.

The district court relied on *Abraham Lincoln* in reaching its conclusion that the offset applied here was appropriate. Though there are factual differences between *Abraham Lincoln* and this case, the Seventh Circuit's sound reasoning and the similarities to the core structure of

the scheme at issue here naturally lead us to conclude that HHS's decision to uphold the offset was not arbitrary, capricious, or manifestly contrary to the legislative scheme.

In *Abraham Lincoln*, the agency found that the amount of the tax ("Tax Assessment") paid by the hospitals to the State of Illinois was a reasonable cost eligible for Medicare reimbursement, but was subject to an offset by payments the hospitals received from the state Medicaid fund. *Abraham Lincoln*, 698 F.3d at 540. The Tax Assessment was required to be deposited into a fund that also included other monies, such as federal matching funds and "any other money received for the Fund from any other source." *Id.* at 545. Under the Illinois legislative scheme, certain hospitals were entitled to receive Medicaid "Access Payments" derived from that fund. *Id.* A hospital's Tax Assessment was contingent upon its receipt of Access Payments and approval from the Center for Medicare and Medicaid Services ("CMS") of the Access Payments and the Tax Assessment. *Id.* at 545–46.

In affirming the agency's judgment, the Seventh Circuit first rejected the hospitals' argument that the offset decision was a misapplication of the regulatory definition of "refund." *Id.* at 548. Under a plain reading of the state legislation—including provisions that (1) the Tax Assessment was not due until the hospitals received access payments, and (2) the Access Payments were not due until the Tax Assessment took effect—the court concluded that the Access Payments clearly served to reduce expenses like the Tax Assessment. *Id.* at 549. This conclusion found further support in the facts that hospitals may only be reimbursed for their net costs, and that the Access Payments were made from the fund in which the Tax Assessment was deposited. *Id.*

Next, the Seventh Circuit rejected the argument that the agency incorrectly decided that the hospitals did not "actually incur" the cost of the Tax Assessment. *Id.* at 551. It reasoned that, under the regulations' net cost approach, it was appropriate to look to the link between the Tax Assessment and the Access Payments to determine the economic impact of receiving the payment on the tax costs. *Id.* at 551–52. Because, in determining reasonable costs, we must look to the totality of the circumstances, the court rejected the hospitals' argument that the costs of the Tax Assessment were actually incurred because they were billed for those costs and paid them. *Id.* at 552. This argument ignored the regulations' requirement that reimbursable costs be

reduced by amounts that defray costs and ignored the real net economic impact of the Access Payments. *Id.*; *see also* 42 C.F.R. § 413.98(d) (noting that refunds are "clearly reductions in costs," so must be taken into account in determining the "true cost" of services, or the "net amount actually paid for them.")

The fundamental elements of the Illinois and Kentucky schemes are the same: under both systems, a tax is paid into a fund, that tax is commingled with other sources, and Medicaid payments derived from that fund are made to hospitals. Appellants are correct that there are differences between the instant case and *Abraham Lincoln*. But these distinctions do not compel a contrary result. For instance, Appellants point to the fact that, unlike in Kentucky, in Illinois hospitals do not pay the Tax Assessment until after they received the Access Payments and receive a refund if the Access Payment is not made. According to the Seventh Circuit, this indicated a legislative intent that Access Payments would reduce the Tax Assessment expenses. *Abraham Lincoln*, 698 F.3d at 549. Nonetheless, there is a similar indication of congressional intent here: Kentucky law states that "provider tax revenues and state and federal matching funds *shall be used to fund* the disproportionate share program." Ky. Rev. Stat. § 205.640(3)(a) (emphasis added). It seems plausible then, that when a provider receives a payment from that fund, the payment serves at least as a partial refund of the tax. As Appellants repeatedly insist, we should look to totality of the circumstances, so we are not limited by the lack of precise similarity between the two systems. Therefore, that the congressional intent in Kentucky was expressed differently than that in Illinois does not undermine our reliance on *Abraham Lincoln*.

Appellants highlight other distinctions, like the fact that under the Illinois scheme, the tax and payments are subject to agency approval and hospitals do not have to incur additional costs by treating non-Medicaid patients. However, these differences do not make the net economic effect of the Appellants' DSH payments out of a fund consisting of their KP-tax payment any less of a refund.[2] Importantly, our goal is not to find the *best* way to interpret the statute, but

---

[2]We are sympathetic to the fact that Appellants have incurred costs of providing indigent care that have not fully been reimbursed. However, we cannot accept their argument that because they still bear 55% of the costs of providing indigent care, they must receive the full reimbursement for their KP-tax assessments. This would require us to determine the net economic effect of DSH payment on *all* of the costs incurred, not simply on the KP-tax cost incurred. Under this logic, hospitals would have to be reimbursed fully for every cost they paid up until the point that they are fully compensated for indigent care. This would render null the refund provisions in all cases where a

rather simply to determine whether a contrary result is *compelled* by the law or congressional intent. *See Thomas Jefferson Univ.*, 512 U.S. at 512. We do not find so here. Under the guidance provided in *Abraham Lincoln*, HHS's offset decision was not arbitrary, capricious, or manifestly contrary to the Medicare statute.

Appellants rely on *Loyola University of Chicago v. Bowen*, 905 F.2d 1061 (7th Cir. 1990), in support of their claim that HHS cannot shift costs to non-Medicare patients. This reliance is misplaced. First, aside from the existence of an offset issue, *Loyola* does not involve a factual scenario remotely similar to the one here. There, the University sought Medicare reimbursement under provisions allowing it to be reimbursed for the reasonable costs of medical services, including the cost of certain medical educational activities. *Id.* at 1064. The designated intermediary, however, reduced the University's reimbursement by fifty percent of the costs of residents and interns working in the University's outpatient clinic. *Id.* The Seventh Circuit concluded that this decision was erroneous. *Id.* at 1073. Unlike Appellants suggest, however, in *Loyola*, HHS did not impermissibly try to shift the costs of training residents and interns onto non-Medicare patients. Rather, HHS contended that the University attempted to do this, but the court disagreed, concluding that the University sought reimbursement only for patient care activities involving Medicare beneficiaries. *Id.* To the extent Appellants argue that allowing Medicaid DSH payments to refund the KP-Tax violates 42 U.S.C. § 1395x(v)(1)(A), by requiring individuals not covered by Medicare to bear costs of services provided by covered individuals, Appellants provide no explanation as to how this scheme requires non-Medicare patients to bear those costs.

In sum, Appellants incurred a reimbursable Medicare cost when they paid taxes on their gross revenue. However, they also received a Medicaid DSH payment to cover some of the costs of providing care to a disproportionate number of low-income patients. Because the DSH payments Appellants received derived from the fund into which Appellants' KP-tax expenditures were placed, the net effect of the DSH payment is to reduce, at least in part, the costs Appellants incurred in paying the KP-tax. Therefore, it constituted a refund notwithstanding the fact that it

---

hospital is not completely compensated for this care; there is no indication that Congress intended this effect. We, therefore, resolve only the narrow question of whether the net economic effect of the DSH payment was to reimburse Appellants for the amount they paid in KP-Taxes, not the amount paid for uncompensated care generally.

was not labelled as such.  *See Kindred Hospitals East, LLC v. Sebelius*, 694 F.3d 924, 928 (8th Cir. 2012) ("Because there was a true reduction in [the plaintiff's] costs incurred because of the pool, the payments it received from the pool looked like refunds, acted like refunds, and were appropriately treated as such, regardless of the label.")

d.

Lastly, although Appellants insist that "[t]he Final Rule does not set out a blackletter rule that disbursements to providers *must* offset taxes associated with the disbursements," Appellant Br. 13 (emphasis added), the Rule makes clear that, in determining the net amount of taxes incurred by a provider, the tax reimbursed should be reduced by the amount received *associated with* that tax.  The Rule provides, in relevant part:

> In situations in which payments that are associated with the assessed tax are made to providers specifically to make the provider whole or partly whole for the tax expenses, Medicare should similarly recognize only the net expense incurred by the provider.  Thus, while a tax may be an allowable Medicare cost in that it is related to beneficiary care, the provider may only treat as a reasonable cost the net tax expense; that is, the tax paid by the provider, reduced by payments the provider received that are associated with the assessed tax.

75 Fed. Reg. 50,363 (August 16, 2010).  Appellants cling to the word "specifically" in the first sentence, maintaining that payments that are associated with the tax must be made specifically for the purpose of making the provider whole for the taxes paid in order for an offset to be appropriate.  However, the subsequent sentence undermines that contention and clarifies that for a tax to be reduced by a separate payment, the payment need only be "associated with the tax." Appellants set forth no meaningful argument that the DSH payments, derived from a fund consisting of the KP-Tax, is not "associated with" that tax.

IV.

For the aforementioned reasons, we **AFFIRM**.