**ADVENTIST LIVING CENTERS, INC., d/b/a LaGrange Colonial Manor, Plaintiff–Appellant,**

v.

**Otis R. BOWEN, Secretary of the United States Department of Health and Human Services and William L. Roper, Administrator of the Health Care Financing Administration, Defendants–Appellees.**

No. 88–2067.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 14, 1989.

Decided Aug. 10, 1989.

---

D. Kendall Griffith, Charles F. MacKelvie, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for Adventist Living Centers, Inc. dba LaGrange Colonial Manor.

Elizabeth M. Landes, Asst. U.S. Atty., Richard A. Urbin, Dept. of Health and Human Services, Anton R. Valukas, U.S. Atty., Nancy K. Needles, Asst. U.S. Atty., Chicago, Ill., for defendants-appellees.

Before CUDAHY and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

CUDAHY, Circuit Judge.

In 1981, plaintiff Adventist Living Centers ("ALC") purchased LaGrange Colonial Manor ("LaGrange"), a provider of skilled nursing services that participates in the Medicare program. Subsequently, ALC became enmeshed in a cost report dispute with its Medicare intermediary about the amount of Medicare reimbursement owed to ALC for depreciation expenses related to assets of the LaGrange facility. ALC commenced this action seeking judicial review of the decision of the Deputy Administrator of the Health Care Financing Administration, who concluded that ALC had overstated its depreciation expense in its 1982 and 1983 cost reports. The district court held that the agency's determination was supported by substantial evidence and accordingly entered summary judgment in favor of the defendants. We affirm.

I.

A. *Medicare Statutory and Regulatory Framework*

Before stating the facts, we shall briefly summarize the Medicare regime within which this case arises. The Medicare program, title XVIII of the Social Security Act, 42 U.S.C. section 1395 *et seq.*, provides

publicly-financed health insurance coverage for the aged and disabled. The program is administered, in part, through contractual arrangements with providers of health care services. *See* 42 U.S.C. § 1395cc. The federal government reimburses providers for the "reasonable costs" of services provided to Medicare beneficiaries through private organizations known as "fiscal intermediaries." Providers apply for Medicare reimbursement by filing annual "cost reports" with intermediaries. 42 C.F.R. § 405.406(b). The intermediaries serve as administrators of the Medicare program by reviewing claims for reimbursement, making disbursements to providers, auditing records of providers to ensure proper payments and recovering overpayments made to providers. *See* 42 C.F.R. §§ 421.100(b), (c), (e), (f) and 421.120(e).

Intermediaries reimburse Medicare providers in accordance with standards established by the Medicare statutes, accompanying regulations and interpretive manuals. The regulations specify that depreciation of certain assets is a reimbursable expense. *See* 42 C.F.R. § 405.415 (1984).[1] At the close of its fiscal year, a provider submits to its intermediary a cost report detailing the costs, including depreciation expense, of services provided to Medicare beneficiaries. *See* 42 C.F.R. § 405.406(b). The intermediary reviews the cost report, makes any appropriate adjustments and computes the amount of Medicare reimbursement owed to the provider. *See* 42 C.F.R. § 405.1803. If a provider is dissatisfied with the intermediary's disposition of its claim for reimbursement, it may request a hearing before the Provider Reimbursement Review Board ("PRRB"). *See* 42 U.S.C. § 1395oo(a). Within 60 days after the provider is notified of the PRRB's decision, the Secretary of Health and Human Services, through his delegate, the Deputy Administrator of the Health Care Financing Administration (the "Secretary"), may

*sua sponte* reverse, affirm or modify the PRRB's decision. *See* 42 U.S.C. § 1395oo(f)(1). If the Secretary's final decision is adverse to the provider, the provider may obtain judicial review. *Id.*

B. *Facts*

On December 4, 1981, ALC[2] contracted to purchase the business and assets of La-Grange, a skilled nursing facility, from Colianni & Dire Company, Inc. ("Colianni") for $2,537,500. This purchase price was based on a valuation of $12,500 per bed times 203 beds. The sales contract specified that ALC agreed to purchase all the assets of LaGrange, "including without limitation, goodwill." Admin. Record at 384. None of the documents memorializing the sale allocated the total purchase price among the individual assets. Following consummation of the sale, Colianni retained C.A. Benson & Associates, Inc. ("Benson") to conduct a valuation of the assets of the LaGrange facility. Relying on the figures contained in the Benson appraisal, Colianni completed its final 1982 cost report and submitted it, along with the appraisal, to its Medicare intermediary, Blue Cross/Blue Shield of Illinois ("Blue Cross"). The Benson appraisal employed various accounting methodologies, including current reproduction cost and fair market value,[3] to allocate the sale price of the LaGrange facility among the separate assets. Relying on the fair market values included in the Benson appraisal, the intermediary assessed Colianni's gain on the sale of the facility and excess depreciation to be recovered by Medicare.

Meanwhile, when ALC completed its own cost reports for fiscal years 1982 and 1983, it included depreciation expenses in connection with the LaGrange assets. In computing its depreciation expense, ALC assigned a total cost of $2,542,000 to the assets based upon their purported fair market val-

---

1. This regulation is currently codified at 42 C.F.R. § 413.134 (1987); however, we shall refer to the regulatory citation throughout this opinion as it existed during the cost years at issue.

2. ALC, a Wisconsin not-for-profit corporation registered to do business in Illinois, currently

owns approximately thirty skilled nursing facilities.

3. Benson labeled the methodologies respectively "Cost Approach" and "Market Data Approach." *See* Admin. Record 316–21.

ue.[4] ALC submitted the cost reports to its intermediary, which is also Blue Cross. When reviewing ALC's cost reports, Blue Cross determined the cost of ALC's depreciable assets based upon the fair market values contained in the Benson appraisal rather than the values included in ALC's cost reports. Applying the fair market methodology, which ascribed $619,500 to non-depreciable goodwill,[5] Blue Cross reduced the amount of ALC's reimbursable depreciation expense by $12,017 for 1982 and $11,320 for 1983.

ALC appealed the intermediary's adjustments to the PRRB. The PRRB determined that the Benson appraisal was the only appraisal submitted that satisfied Medicare requirements. However, the PRRB disagreed with the intermediary's use of the fair market value approach contained in the Benson appraisal. Instead, the PRRB concluded that, according to Medicare regulations, current reproduction cost (adjusted for straight-line depreciation to the date of sale) represented the correct valuation for calculating depreciation expense. Relying upon the current reproduction figures furnished in the Benson appraisal, the PRRB held that the proper cost basis of the assets was $2,330,000. The PRRB attributed the $207,500 difference between this figure and the actual purchase price ($2,537,500) to non-depreciable goodwill.

The Secretary reversed the PRRB's decision *sua sponte*. The Secretary endorsed Benson's fair market value approach, thereby aligning himself with the intermediary, and accordingly assigned $619,150 to non-depreciable goodwill. ALC sought judicial review of the Secretary's decision.

Following cross-motions for summary judgment, the district court affirmed the decision of the Secretary as supported by substantial evidence. The district court rejected ALC's various arguments that Benson lacked the requisite expertise to conduct an appraisal for Medicare purposes,

that Benson was not sufficiently "independent" as required by Medicare regulations and that the intermediary's use of the Benson appraisal violated Medicare rules and notions of fundamental fairness. Moreover, the district court held that there was substantial evidence to support the Secretary's reliance on Benson's fair market value approach as the proper basis for allocating the sale price among the separate assets and for determining reimbursable depreciation expense.

## II.

The Secretary, rather than the district court, is the fact-finder in this case; hence, we owe deference to the Secretary's factual findings while we review the district court's determinations *de novo*. *See Daviess County Hosp. v. Bowen*, 811 F.2d 338, 342 (7th Cir.1987). We review the Secretary's decision pursuant to 42 U.S.C. section 1395oo(f)(1), which incorporates the Administrative Procedure Act's standard of review. *See St. Francis Hosp. Center v. Heckler*, 714 F.2d 872, 873 (7th Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984); *Richey Manor, Inc. v. Schweiker*, 684 F.2d 130, 133 (D.C.Cir. 1982). In accordance with this standard, we may set aside a decision of the Secretary only if it is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law; contrary to constitutional right[s] ...; or unsupported by substantial evidence." *Daviess County Hosp.*, 811 F.2d at 343 (citing 5 U.S.C. § 706). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. Labor Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)); *Anderson v. Bowen*, 868 F.2d 921, 923 (7th Cir.1989). The Secretary's interpretation of regulations issued pursu-

---

**4.** This figure was in excess of the $2,537,500 purchase price. ALC attributed the difference to "negative goodwill."

**5.** For Medicare purposes, amortization of the intangible asset goodwill is not considered reim-

bursable depreciation expense. Thus, we refer to goodwill as "non-depreciable" throughout this opinion only in terms of Medicare depreciation reimbursement.

ant to the complex and reticulated Medicare Act is entitled to considerable deference. *See Bedford Medical Center v. Heckler*, 766 F.2d 321, 323 (7th Cir.1985). *See also St. Francis*, 714 F.2d at 873 (citing *Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); *Griggs v. Duke Power Co.*, 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971)). The fact that the PRRB and the Secretary may have reached different conclusions does not diminish the deference due the Secretary's final decision; "[f]inal responsibility for rendering decisions rests with the agency itself, not with subordinate hearing officers." *St. Francis*, 714 F.2d at 874.

In addition, because we are reviewing *de novo* the district court's order granting summary judgment, we, of course, view the record and the inferences drawn from it in the light most favorable to the non-moving party. *See* Fed.R.Civ.P. 56(c); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## A. *The Benson Appraisal*

The Medicare regulations provide standards for the valuation of assets purchased as part of an ongoing operation by one Medicare provider from another. The purchaser must determine the cost basis for the new facility and calculate the reimbursable depreciation expense to be included in its annual cost reports. The regulations provide for the allowance of depreciation based upon the historical cost of the assets. *See* 42 C.F.R. § 405.415(a)(2).

Historical cost is the cost incurred by the present owner in acquiring the asset. For depreciable assets acquired after July 31, 1970, the historical cost shall not exceed the lower of current reproduction cost adjusted for straight-line deprecia-

tion over the life of the asset to the time of the purchase or fair market value at the time of the purchase.

42 C.F.R. § 405.415(b)(1). When a facility is purchased as an ongoing operation, the regulations provide that the cost basis should be determined as follows:

(1) *Assets acquired after July 1, 1966 and before August 1, 1970.* The cost basis for the assets of a facility purchased as an ongoing operation after July 1, 1966, and before August 1, 1970, shall be the lowest of:

(i) The total price paid for the facility by the purchaser, as allocated to the individual assets of the facility; or

(ii) The total fair market value of the facility at the time of the sale, as allocated to the individual assets; or

(iii) The combined fair market value of the individually identified assets at the time of the sale.[6]

(2) *Assets acquired after July 31, 1970.* For depreciable assets acquired after July 31, 1970, in addition to the limitations specified in paragraphs (g)(1) of this section, the cost basis of the depreciable assets shall not exceed the current reproduction cost depreciated on a straightline basis over the life of the assets to the time of the sale.

42 C.F.R. § 405.415(g).

The seller of the facility must also establish in its final cost report the proper allocation of the sale price among the separate assets and, based upon the assigned values, must calculate its gain or loss on the sale. If a gain is realized, the government may recapture any excess depreciation reimbursements previously furnished to the seller. *See* 42 C.F.R. § 405.415(f)(1). The Secretary's Provider Reimbursement Manual instructs that the assets' sale price recorded by the seller in its final cost report should comport with the historical cost used by the purchaser in computing reimbursable depreciation expense. *See* Prov. Reimb. Man. Part 1, § 104.14(B). The purchaser and seller, however, possess diver-

---

**6.** Because the parties in this case did not specifically identify the individual assets at the time of sale, section (iii) is inapplicable.

gent pecuniary interests with respect to the allocation of the purchase price to depreciable and non-depreciable assets. By allocating as much as possible of the purchase price to depreciable assets, the purchaser can maximize its reimbursable depreciation expenses. Conversely, the seller can minimize the amount of recoupment claimed by Medicare by allocating as little as possible of the sale price to depreciable assets, thereby reducing its reported gain on the sale. Therefore, the allocation to goodwill, a non-depreciable asset, is of considerable consequence.

To accommodate these discordant financial interests, the parties, in negotiating the terms of their contract of sale, may bargain for a specific allocation of the total purchase price among the separate assets. In this regard, the Medicare regulations provide:

> If a provider sells more than one asset for a lump sum sales price, the gain or loss on the sale of each depreciable asset must be determined by allocating the lump sum sales price among all the assets sold, in accordance with the fair market value of each asset as it was used by the provider at the time of sale. *If the buyer and seller cannot agree on an allocation of the sale price ... the intermediary for the selling provider shall require an appraisal by an independent appraisal expert to establish the fair market value of each asset and shall make an allocation of the sales price* in accordance with the appraisal.

42 C.F.R. § 405.415(f)(2)(iv) (emphasis supplied).

In the contract of sale of the LaGrange facility, ALC and Colianni did not stipulate to an agreed allocation of the total purchase price among the individual assets. Consequently, Colianni procured Benson to conduct an appraisal of the facility to determine the value of its assets for Medicare purposes. ALC's principal objection on appeal is that the Secretary's reliance on allocations contained in the Benson appraisal to calculate ALC's reimbursable depreciation expense was arbitrary, capricious and

contrary to law, allegedly violating Medicare regulations and notions of fundamental fairness. ALC claims that Colianni hired Benson surreptitiously to appraise the LaGrange assets and that ALC was not apprised of the appraisal until two years later when its 1982 cost report was audited. ALC asserts that Colianni's actions contravened the regulations, which, as indicated, provide that, if the parties cannot otherwise agree on the proper allocation of the purchase price among the assets of the facility, the "intermediary for the selling provider shall require an appraisal by an independent appraisal expert...." 42 C.F.R. § 405.415(f)(2)(iv).

 Because Colianni (rather than Blue Cross) took the initiative to procure Benson, ALC submits that Benson's report does not qualify as an "independent" appraisal under Medicare rules. This is a troublesome point but ALC adduced no evidence indicating that Benson's appraisal was in any way unfairly partial to Colianni. As the district court noted, the mere fact that Colianni hired Benson does not necessarily discredit Benson's qualifications as an independent appraiser. *See Adventist Living Center v. Bowen,* 686 F.Supp. 680, 684 (N.D.Ill.1988).[7] The seller's intermediary, Blue Cross, the PRRB and the Secretary each accepted the Benson report as a valid independent appraisal complying with Medicare rules. In the absence of evidence to the contrary, we think this consensus view is supported by substantial evidence.

 ALC also challenges Benson's qualification as an "expert" appraiser under Medicare rules. *See* Prov. Reimb. Manual § 134. But ALC's own witness, David Felsenthal, the president of Valuation Counselors (a national appraisal firm), testified that Benson was indeed an expert appraiser. *See* Admin. Record at 168, 199. Although Felsenthal suggested that Benson's appraisal did not reflect much proficiency with Medicare "stuff," *see id.* at 199, Felsenthal also conceded that he was actually unfamiliar with Benson's qualifications and

---

**7.** In fact, as the district court pointed out, Benson's appraisal caused Blue Cross to adjust Colianni's final cost report by approximately $640,-

000, reflecting excess depreciation and gain on sale. *See* Admin. Record at 360.

prior experience in appraising health care facilities. *See id.* at 137. ALC has presented no material evidence impugning Benson's expertise; thus, there is no reason to reject the successive recognition of Benson's credentials by the PRRB, the Secretary and the district court. As the Secretary concluded, the Benson report was the only valid appraisal submitted by any party in this case, and thus was properly relied upon by the intermediary. Appellant's App. at 9. We think substantial evidence supports this conclusion.[8]

■ ALC further contends that the Secretary's reliance on the Benson appraisal violated notions of fundamental fairness because the seller was, in effect, permitted to impose allocations unilaterally without prior notice to ALC. As a result, ALC's depreciation reimbursement was reduced for the 1982 and 1983 cost years and will continue to be reduced over the depreciable life of the LaGrange assets. But the regulations do not *require* the intermediary to obtain comments or approval from the purchaser before accepting an appraisal although this might well be better practice.[9] While it may have been prudent for Blue Cross to inform ALC of the appraisal, there is no legal basis here for disallowance in this regard. Moreover, ALC had an opportunity to protect its interests by negotiating for a specific allocation of the purchase price in the contract, thereby obviating the need for an independent appraisal. But, for whatever reason, ALC neglected to do this. *See Vallejo General Hosp. v. Bowen,* 851 F.2d 229, 232 (9th Cir.1988) (when term of contract provided for allocation of purchase price, court rejected appraisal figures of purchaser who had opportunity to negotiate the specific contractual allocation and

did not explain its failure to do so). Nor did ALC at any time during this protracted dispute submit its own valid appraisal to the intermediary, the PRRB or the Secretary. ALC apparently slept to some degree on its prerogatives; hence, we do not believe that the Secretary's reliance on the Benson appraisal violated notions of fundamental fairness. *Cf. Richey Manor, Inc. v. Schweiker,* 684 F.2d 130, 135–36 & n. 7 (D.C.Cir.1982) (seller of health care facility, alleging injustice because it had no notice of the adverse reimbursement consequences of the sale, was not entitled to revaluation of assets when regulations were not misleading and it was careless in failing to consult the intermediary).

■ ALC also challenges the Benson appraisal on the ground that it was not formally pre-approved by the intermediary. The Provider Reimbursement Manual states:

> *Approval of an Appraisal.*—Before an appraisal is made for Medicare purposes, the provider will inform its intermediary of its intent, and the reason for the appraisal. The provider will also make the proposed appraisal agreement available to its intermediary.... The intermediary will promptly determine if the firm qualifies as an expert, and whether the proposed appraisal meets program requirements regarding type, technique, and results.

Prov. Reimb. Man., Part 1, § 134.1. This guideline prescribes a practice that furthers fairness and accuracy in an appraisal. But, in light of the intermediary's subsequent approval of the appraisal, later endorsed by the Secretary, we cannot overturn the decision on this ground. "The failure of the intermediary to follow a mi-

---

8. On a more technical note, ALC argues that the Benson appraisal was invalid because Benson failed to specifically mention in its letter of certification that the appraisal was conducted in conformity with Medicare regulations as directed by section 134.10 of the Provider Reimbursement Manual. We do not think this omission is fatal. While the Manual establishes guidelines for Medicare appraisals, it does not purport to compel compliance in every detail under threat of disallowance nor to divest the Secretary of some discretion in approving appraisals upon determining that they satisfy Medicare standards.

9. In its reply brief, ALC cites for the first time the extensive change of ownership provisions contained in the updated Provider Reimbursement Manual and Intermediary Manual, which impose an obligation on intermediaries to assume a more active supervisory role in change of ownership transactions. *See* Prov. Reimb. Man., Part 1, § 1501; Interm. Man., Part 4, §§ 4500 *et seq.* ALC's reliance on these provisions is untimely and, more importantly, the provisions were not in effect during the relevant cost years.

nor procedural guideline does not render the Secretary's decision unsupported by substantial evidence or contrary to law." *See Adventist Living Center,* 686 F.Supp. at 685.[10]

**B. *Reimbursement of Depreciation Expense***

Finally, ALC claims that the Secretary misapplied the Medicare regulations by employing the wrong methodology for allocating the purchase price of the facility among the individual assets, resulting in an incorrect calculation of reimbursable deprecia-tion expense. As noted, the regulations provide that the lump sum sale price of a facility should be allocated among the individual assets based upon each asset's fair market value. 42 C.F.R. § 405.415(f)(2)(iv).[11] It is undisputed that the LaGrange facility, comprising land, building, land improvements, furniture, fixtures and goodwill, if any, was purchased for a total price of $2,537,500. The Benson appraisal allocated this price among the assets employing the fair market value and current reproduction cost valuation methods as follows:

| Asset | Fair Market Value | | Current Reproduction Cost |
|---|---|---|---|
| Land | 543,025 | (535,000)[12] | 535,000 |
| Building | 1,025,105 | (1,010,000) | 1,450,000 |
| Land Improvements | 45,720 | (45,000) | 45,000 |
| Furniture, Fixtures & Equipment | 304,500 | (300,000) | 300,000 |
| Goodwill | 619,150 | (610,000) | |
| Total | 2,537,500 | (2,500,000) | 2,330,000[13] |

*See* Admin. Record at 285, 314, 322.

The parties are in fundamental disagreement over the appropriate analysis to be applied to these figures. Resolution of this dispute turns on the proper interpretation of section 405.415(g)(1) and (2) of the Medicare regulations. As noted, paragraph (g)(1) provides in relevant part that the cost basis for assets purchased after July 1, 1966, and before August 1, 1970, should be the lower of (1) the total price paid for the facility or (2) its total fair market value, as allocated to the individual assets. 42 C.F.R. § 405.415(g)(1)(i) and (ii).[14] Paragraph (g)(2) then states: "For *depreciable* assets acquired after July 31, 1970, in addition to the limitations specified in paragraphs (g)(1) of this section, the cost basis of the *depreciable* assets shall not exceed the current reproduction cost...." (emphasis supplied).

ALC insists that paragraphs (g)(1) and (g)(2) of section 405.415 require the Secretary to determine the lowest overall valua-

---

**10.** The Provider Reimbursement Manual is not a regulation; rather, it is published by the Health Care Financing Administration, an arm of the Secretary, to instruct providers in the application of reimbursement regulations. *Daviess County Hosp.,* 811 F.2d at 345. In light of the considerable deference owed to the Secretary's construction of its own interpretive rules, we will accept the Secretary's determination that the Benson appraisal was a valid appraisal for Medicare purposes, notwithstanding this procedural flaw.

**11.** Similarly, section 104.14 of the Provider Reimbursement Manual provides:
> In establishing the historical cost of assets where an on-going facility is purchased through a bona fide sale after June 30, 1966, the sale price or portion thereof attributable to the asset must not exceed the fair market value of the asset at the time of sale.
*See* Appellant's App. at 46.

**12.** The figures in parentheses represent the initial fair market values assigned by Benson and were cited by the district court in its review of the appraisal. However, because the sum of these figures does not total the actual sale price of $2,537,000, the values were adjusted proportionately. *See* Admin. Record at 322, 376. The Secretary determined that the adjustments were inconsequential. *See* Appellant's App. at 10.

**13.** The Benson report erroneously indicated that the total current reproduction cost was $2,350,-000.

**14.** *See supra* note 6 and accompanying text.

tion, choosing among the total purchase price, the fair market value and the current reproduction cost. Focusing on these three methods of valuation, current reproduction cost, $2,330,000, would be the lowest composite figure and thus the proper cost basis for calculating reimbursable depreciation expense. Under the approach as posited by ALC, nothing would be allocated to goodwill.[15] The PRRB agreed with ALC that current reproduction cost was the proper valuation method. But the PRRB then determined that the difference between the $2,330,000 current reproduction cost and the actual purchase price, $2,537,500, represented non-depreciable goodwill in the amount of $207,500.[16]

The Secretary disagreed with the construction of the regulations adopted by ALC and the PRRB. Instead, the Secretary construed paragraph (g)(1) of the regulations (as incorporated by paragraph (g)(2)) to provide that the proper cost basis is the lower of the total purchase price of the facility or the total fair market value of the assets. The Secretary then determined that paragraph (g)(2) added a further requirement, applicable only to *depreciable* assets, that *their* cost basis not exceed the current reproduction cost adjusted for straight-line depreciation. Since the fair market value of the depreciable assets (building, improvements, furniture, fixtures and equipment) was lower than their current reproduction cost, the Secretary concluded that the current reproduction cost limitation in (g)(2) was inapplicable. The Secretary indicated that the PRRB had erred by comparing the total fair market value, including non-depreciable goodwill, with the total current reproduction cost, which does not involve goodwill. In effect, this was an apples and oranges comparison yielding invalid conclusions. Applying the regulations in this fashion, the Secretary ruled that the fair market value approach yielded the lowest valuation and, therefore, established the correct cost basis for allocating the sale price to the individual assets. *See* Appellant's App. at 10.

We agree with the district court that the Secretary's position is a reasonable interpretation of the regulations, is not contrary to law and is supported by substantial evidence. Paragraph (g)(2) expressly states that it applies only to depreciable assets. Moreover, this interpretation is consistent with the definition of historical cost (upon which depreciation is based): "For *depreciable* assets acquired after July 31, 1970, the historical cost shall not exceed the lower of current reproduction cost ... or fair market value...." 42 C.F.R. § 405.415(b)(1). When referring to current reproduction cost in paragraphs (b)(1) and (g)(2), the regulations appropriately limit the analysis to depreciable assets. Hence, we cannot accept ALC's argument that the Secretary should have compared the total current reproduction cost with the total fair market value. According due deference to the Secretary's interpretation of regulations, we think the Secretary's decision was clearly reasonable and supported by substantial evidence. Because there was no genuine issue for trial, summary judgment for the defendants is

AFFIRMED.

---

15. ALC argues that the contract of sale did not contemplate any allocation to goodwill and that, based on its own expert's testimony, the sale actually encompassed negative goodwill. ALC's argument is apparently contradicted, however, by the language of the sales agreement, which specifies that ALC agreed to purchase all the assets of LaGrange, "including without limitation, goodwill." Admin. Record at 384. Moreover, ALC never submitted an acceptable appraisal supporting its position that the sale included negative goodwill.

16. In the event that we reject ALC's position that the sale involved no positive goodwill, ALC alternatively requests that we accept the view of the PRRB.