**HINSDALE HOSPITAL CORPORATION,**
**Plaintiff–Appellant,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant–Appellee.**

No. 94–3020.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1995.

Decided March 24, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied May 30, 1995.

---

Dorothy Ward, Lawrence A. Manson (argued), Chicago, IL, for plaintiff-appellant Hinsdale Hosp.

Alvin N. Jaffe (argued), Dept. of Health and Human Services, Region V, Office of the Gen. Counsel, Deborah A. Hill, Office of the U.S. Atty., Civil Div., Appellate Section, Chicago, IL, for defendant-appellee Donna E. Shalala, Secretary, Department of Health and Human Services.

Before CUDAHY, ESCHBACH, and RIPPLE, Circuit Judges.

ESCHBACH, Circuit Judge.

Hinsdale Hospital Corporation ("Hinsdale") brought this action pursuant to 42 U.S.C. § 1395oo(f) to contest the decision of the Secretary of Health and Human Services ("Secretary") to deny certain amounts of Medicare reimbursement claimed by Hinsdale for interest expenses. The district court granted the Secretary's motion for summary judgment and upheld the denial of reimbursement. We affirm.

I.

Hinsdale Hospital is a 465-bed acute tertiary care, non-profit hospital located in Hinsdale, Illinois. Although separately incorporated in Illinois, it is a member of a nationwide Adventist health care system ("Adventist") sponsored by the Seventh–Day Adventist Church. Adventist controls its health care system through a corporate parent and four regional corporations.

Hinsdale is a provider of medical services in the Medicare program, 42 U.S.C. § 1395–1395ccc, which provides health insurance for the aged and disabled. For the years in question, the Medicare program reimbursed providers for the "reasonable cost" of medical services provided to eligible beneficiaries. 42 U.S.C. § 1395f(b)(1).[1] "Reasonable cost" is defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services," as determined in accordance with regulations promulgated by the Secretary. 42 U.S.C. § 1395x(v)(1)(A). The statute further provides that "[s]uch regulations shall take into account both direct and indirect costs of providers of services" so that costs for Medicare eligible patients will not be shifted to patients covered by private insurance and vice versa. *Id.* Under the regulations adopted by the Secretary, providers may be reimbursed for interest expense on "both current and capital indebtedness" if the expense is "necessary and proper." 42 C.F.R. § 413.153(a)(1).[2] For an interest expense to be "necessary," it must be "[i]ncurred on a loan made to satisfy a financial need of the provider, 42 C.F.R. § 413.153(b)(2)(i), and "reasonably related to patient care." 42 C.F.R. § 413.153(b)(2)(ii). To avoid reimbursing interest on loans which result in excess funds or investments, any interest

---

1. The Social Security Amendments of 1983 instituted a prospective payment system for cost years beginning on or after October 1, 1983. Pub.L. No. 98–21, Title VI, 97 Stat. 149 (1983), codified at 42 U.S.C. § 1395ww. The events giving rise to the challenge in this case occurred prior to the institution of this system.

2. Until redesignation in 1986, this regulation was 42 C.F.R. § 405.419 (1982). All references in this opinion are to the newer codification.

expense that is found to be reimbursable will be offset by interest earned on investments. 42 C.F.R. § 413.153(b)(2)(iii). Each year, Hinsdale is required to file a cost report with a fiscal intermediary who is contracted by the Secretary to ascertain the amount of reimbursement which accurately reflects the "reasonable cost" of the Medicare services provided.

In November 1982, Hinsdale's corporate parent, Adventist, decided to acquire a 149-bed acute care hospital located in Glendale Heights, Illinois. The facility, then known as Midwest Community Hospital, was constructed in 1980, but had not developed into a profitable institution. On November 18, 1982, Adventist created an Illinois non-profit corporation, Glendale Heights Community Hospital, Inc., ("GHCH"), to purchase and operate the hospital under the name of Glendale Hospital ("GH"). Like Hinsdale, GHCH would be under the regional control of Adventist. However, Adventist could not finance the transaction itself and GHCH was unable to independently secure financing of the purchase price of approximately $33.8 million since the only collateral it could offer was the financially distressed GH. Consequently, Adventist directed Hinsdale to enter into an agreement to purchase GH. In order to obtain the necessary interim financing to complete this acquisition on November 24, 1982, the lenders required Hinsdale to place GH within its own operating corporation for 7–9 months until permanent financing could be arranged. Since restrictive covenants in Hinsdale's 1978 and 1981 municipal bond issues precluded it from transferring GH to GHCH, Adventist knew that permanent financing would be needed to refinance Hinsdale's own debt and accomplish the goal of placing GH within GHCH. During this interim period when GH's liabilities appeared on Hinsdale's books, Hinsdale transferred $5.9 million to GH to provide for its working capital needs. GH continued, however, to maintain a separate medical staff and governing body while it awaited the permanent financing which would allow it to become an independent entity under GHCH within the Adventist system.

Permanent financing was finally arranged through two separate tax-exempt municipal bond issues. First, on May 20, 1983, the village of Glendale Heights issued $35 million in 5-year bonds ("GH Bonds") which were used to retire the interim financing and as reimbursement for other acquisition costs. Second, on July 12, 1983, the village of Bolingbrook issued $44.8 million in refunding and improvement bonds ("BLB bonds"). Approximately $38.9 million of the total was used to refinance Hinsdale's outstanding 1978 and 1981 bonds and the remaining $5.9 million was used by Hinsdale for certain capital expenditures. Thus, with the restrictive covenants in Hinsdale's 1978 and 1981 bonds removed, GH was transferred to GHCH on July 12, 1983. As a result, GHCH assumed the obligation for the $35 million bond issue and, in December 1984, confirmed that it owed Hinsdale $7.5 million, including the $5.9 million initial transfer and other related amounts.

In subsequent years, Hinsdale included among its Medicare costs eligible for reimbursement the interest payments it made on the $5.9 million from the BLB bond issue it used for Hinsdale's capital expenses. The fiscal intermediary contracted by the Secretary to process Hinsdale's reimbursement claim, Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Illinois ("the intermediary"), initially did not question the necessity of this interest expense and merely offset the interest income accrued from Hinsdale's loan of $5.9 million to GH against Hinsdale's interest expense for fiscal years 1983 and 1984. However, in 1986, Hinsdale determined the $5.9 million loan was uncollectible and wrote it off, which prompted the intermediary to reexamine the entire transaction.[3] The intermediary determined that the additional $5.9 million borrowed in BLB bonds in July 1983 was unnecessary because Hinsdale could have used the money it transferred to GH for its own capital expenditures. Thus, the intermediary

---

3. Under 42 C.F.R. § 405.1885, a determination by an intermediary may be "reopened" within three years.

disallowed the interest expense for that portion of Hinsdale's debt for the fiscal years in dispute, 1985 through 1988,[4] resulting in a total disallowance of approximately $1,070,-000.

Pursuant to 42 U.S.C. § 1395oo(a), Hinsdale appealed the reduction of its Medicare reimbursement to the Provider Reimbursement Review Board ("the Board"). After an evidentiary hearing and post-hearing briefs, the Board upheld the intermediary's determination on December 30, 1992. The Administrator of the Health Care Financing Administration elected not to review the Board's decision. Thus, under 42 U.S.C. § 1395oo(f)(1), it became the final decision of the Secretary.

On February 25, 1993, Hinsdale filed a complaint for judicial review in the district court. The matter was referred to a magistrate, who recommended that the Secretary's decision be reversed. On June 22, 1994, the district court rejected the magistrate's recommendation and affirmed the Secretary's decision. Hinsdale filed a timely notice of appeal pursuant to 28 U.S.C. § 1291.

## II.

■ Hinsdale challenges the Secretary's determination, through its Provider Reimbursement Review Board, that $5.9 million of Hinsdale's 1983 BLB bond borrowing was unnecessary, and thus interest expenses to service that debt are not reimbursable. Our review of the Secretary's decision is limited. While we examine the district court's decision *de novo, Adventist Living Centers, Inc. v. Bowen,* 881 F.2d 1417, 1420 (7th Cir.1989), judicial review of the Secretary's decision is governed by 42 U.S.C. § 1395oo(f), which incorporates the standard of review of the Administrative Procedure Act ("APA"). *Thomas Jefferson Univ. v. Shalala,* — U.S. —, —, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994); *Loyola Univ. of Chicago v. Bowen,* 905 F.2d 1061, 1066 (7th Cir.1990). Under the APA, we will "hold unlawful and set aside" an agency determination only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

contrary to constitutional right, power, privilege, or immunity; exceeding statutory jurisdiction, or falling short of statutory right; reached in violation of established procedure; or unsupported by substantial evidence." 5 U.S.C. § 706(2)(A); *Thomas Jefferson Univ.,* — U.S. at —, 114 S.Ct. at 2386; *Loyola Univ.,* 905 F.2d at 1066–67. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Loyola Univ.,* 905 F.2d at 1067, (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)).

In our review "[w]e must give substantial deference to the agency's interpretation of its own regulations." *Thomas Jefferson Univ.,* — U.S. at —, 114 S.Ct. at 2386. "Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* (citations omitted). This deference is particularly warranted when, as here, the Secretary is interpreting regulations "issued pursuant to the complex and reticulated Medicare Act," *Adventist Living Centers, Inc.,* 881 F.2d at 1420–21, "in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Thomas Jefferson Univ.,* — U.S. at —, 114 S.Ct. at 2387, (quoting *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 697, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991)).

■ The Board determined that the 1983 bond borrowing was unnecessary. It found that Hinsdale's decision to purchase GH was made by its corporate parent, Adventist, and was not part of any deliberate plan by Hinsdale to make an investment for the purpose of expanding patient care activities. While the Board acknowledged that Hinsdale's temporary acquisition of GH required it to reflect GH as an operating division of Hinsdale for financial reporting purposes, this was found to be merely a short-term accommoda-

---

4. The intermediary did not change the 1983 and 1984 figures since the interest offset from the GH loan before it was written off made an adjustment unnecessary.

tion. It was done to facilitate Adventist's goal of having GH as an independent member of the system. Consistent with this intent, the Board found that GH continued to maintain its independent status even during the short period it appeared on Hinsdale's books. GH was never held out to the public as a branch or subsidiary of Hinsdale. GH was at all times separately certified and licensed as a hospital and it maintained a separate medical staff and governing body. Moreover, the Board found that the $5.9 million was transferred, not as an intra-corporate transfer, but as a loan evidenced by the issuance of interest-bearing promissory notes. These factual findings are supported by substantial evidence. Thus, the interest expense was not incurred on a loan made to satisfy a financial need of Hinsdale, but was instead made to satisfy a need of Hinsdale's parent, Adventist. 42 C.F.R. § 413.153(a)(1).

In making its decision, the Board strengthened its analysis by relying upon the "related organizations" principle in 42 C.F.R. §§ 413.153(c) and 413.17(a). Since Hinsdale and GH are affiliated corporations under the common control and direction of Adventist, they were related for the purposes of 42 C.F.R. § 413.17(b)(1). Under § 413.153(c), interest expense on indebtedness between related parties is not allowable except in several narrowly proscribed situations. Under § 413.17(a), the reimbursable cost of goods provided by a related organization are limited to the cost of the goods to the related organization unless the related organization can establish that the price charged was in line with the open market. The Board determined that the diversion of funds by one related entity to another related entity cannot create a bona fide need to borrow on behalf of the entity providing the diverted funds. The principle was not technically applicable here since Hinsdale did not borrow from a related organization, GH is not claiming reimbursement for any interest payments to Hinsdale, and no goods were sold between the organizations. However, the Board cited several instances in which courts have used the related organizations rule as a guiding principle in determining a provider's "reasonable cost." *See Monongahela Valley Hosp., Inc. v. Sullivan,* 945 F.2d 576, 591–92 (3d Cir.1991); *Forsyth County Hosp. Auth., Inc. v. Bowen,* 856 F.2d 668, 670 (4th Cir.1988). In both cases, a provider's interest expense was offset by the investment income of a related party after the provider had transferred funds to the related party. The interest expense was thus unnecessary because the parent's income was available to the provider. *See Forsyth County Hosp. Authority, Inc.,* 856 F.2d at 670. This is similar to the instant case in which Hinsdale made funds available for Adventist's corporate plans. The only difference is that Hinsdale's transfer created the need to borrow $5.9 million in the first place, and, consequently, that portion of the borrowing was unnecessary. It was thus not "plainly erroneous or inconsistent with the regulation" for the Board to determine that, in light of the relatedness of the parties, Hinsdale's transfer of money to GH created nothing more than an artificial need for Hinsdale.

Hinsdale cites our decision in *Northwest Hosp., Inc. v. Hospital Serv. Corp.,* 687 F.2d 985 (7th Cir.1982), for the proposition that the related organizations principle should not be used to deny reimbursement where the underlying transaction for which the expense was incurred is objectively prudent in its terms and structure. In *Northwest Hospital,* a for-profit hospital with three stockholders wished to convert to a non-profit hospital. A new corporation was formed and it issued below-market interest-bearing promissory notes to the three stockholders. The Secretary disallowed the hospital's attempt to claim interest expenses due to the prohibition on interest expenses between related parties. *Id.* at 987–88. This court held that such a blanket disallowance is inappropriate where the loan was objectively reasonable because it conflicts with the statutory mandate to reimburse all "reasonable costs." *Id.* at 992; *see Trustees of Indiana Univ. v. United States,* 618 F.2d 736, 739, 223 Ct.Cl. 88 (1980).

While the Board did not need to refer to the related organizations principle to justify the result in this case, nothing in the Board's decision conflicts with the principles enunciated in *Northwest Hospital.* In the only loan between related parties in this case, the loan

from Hinsdale to GH, GH has neither applied for nor been denied reimbursement for any interest expense. The principle's application in this case has been as a guide in determining what costs are necessary. This use of the related organizations principle within a determination as to what costs are necessary is exactly what was adopted in *Northwest Hospital. Id.* at 995. Moreover, the circumstances in the instant case justify the Board's reference to this principle. In *Northwest Hospital,* the financial need was created by the provider's own desire to change its corporate structure. The only question was whether the terms of the loan were reasonable in light of the relatedness of the parties, not whether the provider's desire to change its corporate structure was reasonable. By contrast, the Board found that Hinsdale's actions were solely motivated by the needs of its corporate parent, Adventist. The relatedness of the parties called into question Hinsdale's need, and therefore the necessity of the loan. The transfer of money was not akin to a poor investment where a provider attempts to make money, but instead finds itself left with a true financial need.[5] Instead, this transaction was engineered by Adventist in such a way that Hinsdale neither attempted to make money nor to serve its own patient needs. In effect, it was an attempt to shift the costs of completing the transaction from a non-Medicare provider, Adventist, to a Medicare provider, Hinsdale.[6]

*Cf. Portland Adventist Medical Ctr. v. Heckler,* 561 F.Supp. 1092, 1096–97 (D.D.C.1983) (borrowing not necessary where need created by diversion of funds to a non-reimbursable project). This is antithetical to the statutory directive against cost-shifting. 42 U.S.C. § 1395x(v)(1)(A).

 Hinsdale protests that the Board arrived at this conclusion by examining the intent of the parties when it had no authority in the statutes or regulations to make such an examination. According to Hinsdale, the facts as they existed when the $5.9 million was transferred were that GH and Hinsdale were within the same corporation and the transfer of funds was made necessary by their corporate responsibilities. However, evaluating whether a loan is truly necessary requires an examination of the events and transactions creating the underlying need. Since interest expense is only allowable where it is "[i]ncurred on a loan made to satisfy a financial need of the provider," 42 C.F.R. § 413.153(b)(2)(i), the Board reasonably explored Hinsdale's intent in making the loan which occasioned the need. In *Northwest Hospital,* we discussed the circumstances surrounding the denial of reimbursement for interest expenses in *Caylor–Nickel Hospital, Inc. v. Califano,* CCH Medicare & Medicaid Guide ¶ 29,619 (N.D.Ind. March 1, 1979). *Northwest Hosp.,* 687 F.2d at 995. This court cited several portions of the *Caylor* opinion, including one in which the court

---

**5.** Thus, it is not economically irrational for Medicare to reimburse for financial needs which arise from bad investments, but not for needs which arise from the diversion of funds to related organizations at the direction of a provider's corporate parent. In the former situation, the Secretary has made the policy decision that Medicare will not or is unequipped to attempt to second guess the economic reasonableness of an investment. However, where a transfer of money is made without an economic or patient services motive, but merely to carry out the goal of a provider's corporate parent in an acquisition, the Secretary is uniquely qualified to investigate the transaction.

**6.** Of course, if Adventist had arranged to finance the operating costs of GH itself or with its own operations as collateral, GH would have been reimbursed on any interest expense incurred on a loan from Adventist under the "religious order" exception in 42 C.F.R. § 413.153(c)(2). However, Adventist would not then be able to

claim a reimbursement on interest it paid to secure a replacement for the money it loaned to GH or to service a loan which allowed it to transfer funds to GH. The dissent suggests that where a loan is uncollectible so that replacement funds are necessary, Adventist should not be required to suffer the loss and thereby relieve Medicare of its duty to share expenses. Yet, Medicare has no duty to reimburse a lender when a provider defaults on a loan, unless, perhaps, the lender also happens to be a Medicare provider. Since Adventist is not a Medicare provider and the acquisition was for its benefit, it is appropriate and prudent that Adventist bear the risk that GH will default on its loan. When Adventist directed Hinsdale to advance the funds to GH, Adventist sought to shift its risk to a Medicare provider so that the Secretary became the guarantor of the loan to GH. In this manner, Hinsdale asks Medicare to pay for an acquisition which would not otherwise be reimbursable.

examined whether there appeared "to be any legitimate business reason for the underlying transaction," and discussed "the sole purpose of the arrangement." *Id.* Although rejecting the *Caylor* court's upholding of the blanket disallowance for related party interest, this court approved of a process of examining the totality of circumstances surrounding the underlying transactions in determining whether interest expense was necessary under the regulations. *Id.* Thus, the nature of the Board's inquiry was not unreasonable.

■ The Board's findings as to Hinsdale's intent in making the transfers are well-supported by the evidence. Hinsdale admits that Adventist created GHCH with the intent of acquiring GH as an independent member of the Adventist system. Hinsdale also admitted in its position paper before the Board that "[t]he $5.9 million that ultimately was loaned by the Provider to Glendale was to sustain Glendale's operations and to accomplish the desired objective of spinning-off Glendale into GHCH." (A.R. 340). The contemporary evidence confirms this intent. Hinsdale made a loan rather than an intracorporate transfer of the money to GH, and it was jointly obligated with GH on the May 1983 GH bonds, before Hinsdale's debt was refinanced and the restrictive covenants removed. Thus, GH was treated as a separate organization. Even if Hinsdale was forced to make the transfers by the restrictive covenants, it was still to satisfy Adventist's needs rather than Hinsdale's. When Adventist directed Hinsdale to make the acquisition, Adventist knew about the lenders' requirements for collateral and it also knew about the restrictive covenants which would temporarily force Hinsdale to show GH on its books. Adventist essentially directed Hinsdale to provide for GH's working capital needs, and Hinsdale incurred that obligation because of Adventist's need. Given the substantial deference owed to the decision of the Secretary in this matter, we cannot say that it was unreasonable for the Board to conclude that Hinsdale's loan to GH was to satisfy a financial need of Adventist rather than Hinsdale, and therefore was not reimbursable.

## III.

For the foregoing reasons, the decision of the district court is

AFFIRMED.

CUDAHY, Circuit Judge, dissenting.

In its progress through the review process this matter has drawn dissent—either formally or in practical effect—at every level. Thus, in the Provider Reimbursement Review Board, Member Sloan dissented on the ground that, when Hinsdale transferred the $5.9 million to Glendale Heights, Glendale Heights was "under Hinsdale's corporate structure" and "should be treated as if it were a hospital department." And "all Medicare regulations allow borrowing when it is to benefit a provider department." This seems to me to put the matter succinctly and accurately.

Later, Magistrate Judge Guzman said in his recommended decision, "Hinsdale is correct when it argues that [the disputed $5.9 million] was in fact a necessary and reasonable cost because it was being used to satisfy a financial need of the provider and was reasonably related to patient care." The magistrate judge, as the majority indicates, recommended that Hinsdale should prevail.

I am as sensitive as the majority to the need to defer to the Secretary in the difficult task of interpreting the Medicare Regulations. But I do not believe deference should be carried to the point of defeating the essential statutory purpose, which is that Medicare should reimburse provider hospitals for the reasonable and necessary costs of caring for Medicare patients. Here the cost of providing working capital to enable patient care in Glendale Heights (then an "extension" or, in Member Sloan's words, a "department," of Hinsdale) to continue seems to me an eminently valid and reasonable cost for Medicare to reimburse. The effect of the majority decision is to shift those Medicare patient care costs onto non-Medicare patients—a violation of the statute. *See* 42 U.S.C. § 1395x(v)(1)(A) (1988). "[T]he necessary costs of efficiently delivering the covered services to individuals covered by the [Medicare Program] . . . will not be borne by individu-

als not so covered...." 42 U.S.C. § 1395x(v)(1)(A)(i) (1988).

The majority decision, as did the decision of the Review Board before it, seems to turn primarily on the argument that Hinsdale's advance or transfer of funds sprang not from some internal or "intrinsic" need of its own but from an "artificial" need arising from the requirements of Adventist in acquiring Glendale Heights. It is not my position that the intent of Hinsdale in transferring the funds is wholly irrelevant, or that the part played by other actors in inducing the transfer is irrelevant. But I believe that the facts as they existed at the time of transfer are the critical facts. *Cf. St. Bernard's Hospital v. Sullivan,* 781 F.Supp. 576 (E.D.Ark.1991); *St. Francis Hospital v. Sullivan,* 1990 WL 284514, 1991 U.S.Dist. LEXIS 10719 (Dist. Del.). The surrounding circumstances are only of concern if they somehow violated the letter or the spirit of the statute or of the regulations, evidenced imprudence or in any way interfered with the central purpose of cost-sharing. In my view it defeats the key purpose of cost-sharing to ignore Hinsdale's responsibilities for patient care at Glendale Heights, merely because Glendale Heights' patients became Hinsdale's patients partly as a result of Adventist's efforts to acquire Glendale Heights. The objective reality at the time of transfer was that Hinsdale and Glendale Heights were both the responsibility of Hinsdale's board, that Glendale Heights' patient care needs required a cash infusion and that Hinsdale responded appropriately to this need. Medicare should share in the cost of meeting this need since Medicare patients were benefited.

The basic facts of the surrounding circumstances leading up to Hinsdale's responsibility for Glendale Heights' patients are not in dispute. Glendale Heights was financially distressed and highly uncreditworthy. Adventist proposed to buy the failing hospital and bring it into its system. Presumably, the transaction could not be financed on Glendale Heights' credit from third party sources, at least not at reasonable rates of interest. There is no doubt that, had funds been found somewhere even at extortionate rates of interest, the debt representing those funds could have been incorporated into the Glendale Heights capital structure and the inflated interest would have been quite properly reimbursable by Medicare. That interest would have met a financial need of Glendale Heights and would have been reasonably related to patient care—the statutory and regulatory tests.

In its footnote 6, the majority notes that the funds might have been provided by Adventist itself. Possibly they could have been (although this is pure speculation), but, as the majority notes, the interest on Adventist's loan would have been reimbursable to Glendale Heights, and Medicare would thereby have paid its fair share. However, footnote 6 goes on to indicate the financial consequences to Adventist if it had had to borrow money as a "replacement" for its advance to Glendale Heights. But, the issue of interest reimbursement on the "replacement" would be irrelevant unless, as on the facts of the case before us, the "loan" were uncollectible and instead amounted to a gift. On those facts, certainly, there would have been no duty under the statute or the regulations for hospital systems like Adventist to make gifts of working capital to their constituent hospitals in ways which relieve Medicare of its duty to share in the costs of hospital care to Medicare patients. The reality here is that the Secretary has not pointed to any impropriety, imprudence or law violation in the way the Adventist system provided for the various steps in financing the acquisition of Glendale Heights. Nor has the Secretary shown that Medicare would have been charged with more than its fair share of the working capital costs at Glendale Heights if Hinsdale's argument had prevailed. Therefore, it seems to me that the surrounding and motivating circumstances are essentially neutral, and we ought properly to focus on the crucial problem of Hinsdale's need to advance funds, *at the particular time of the advance,* to provide patient care in Glendale Heights.[1]

---

**1.** The majority asserts in footnote 6 that the working capital loan was for the "benefit" of Adventist and that Adventist should "bear the risk that Glendale Heights will default on its loan." This is tortured reasoning. The loan or transfer of funds was for the direct benefit of

The advance of funds to provide working capital at Glendale Heights went to meet a financial need of the provider (Hinsdale, which then included Glendale Heights) and was reasonably related to patient care. At the time the advance or loan was made, Hinsdale and Glendale Heights shared the same corporate structure, and patient care at Glendale Heights was the responsibility of the Hinsdale Board. The funds were advanced for purposes reasonably related to patient care. Barring some claim of impropriety or imprudence in the process under which Glendale Heights came to occupy a place in the Hinsdale corporation, I see no reason to look beyond the facts as they existed when the funds were transferred. It seems to me irrelevant that, as the Board pointed out, the housing of Glendale Heights as an operating division of Hinsdale was "a short-term accommodation." Nor is it relevant that this arrangement "facilitated Adventist's goal." It is certainly not relevant that Glendale Heights "was never held out to the public as a branch or subsidiary of Hinsdale." Nor is it really material whether the $5.9 million was an "intra-corporate transfer" or a "loan." The only relevant fact is that the transfer or loan was made to meet the patient care needs of the patients at Glendale Heights, which was for the time being a mere extension of Hinsdale and a responsibility of the Hinsdale Board. That Board would have been in breach of its fiduciary duty to Glendale Heights had it failed to advance the funds. Whether Adventist was pleased or displeased by this turn of events is totally irrelevant with respect to the fundamental objective of sharing patient care costs equitably between Medicare and non-Medicare patients.

In this case, as the majority notes, the Board relied on the related organizations principle to conclude "that the diversion of funds by one related entity to another cannot create a bona fide need to borrow on behalf of the entity providing the diverted funds."

The majority concedes that the related organizations principle is not "technically applicable here" but cites certain cases where the courts have used the related organizations rule as a "guiding principle" in determining a provider's "reasonable cost." *See Monongahela Valley Hosp., Inc. v. Sullivan,* 945 F.2d 576, 591–92 (3d Cir.1991); *Forsyth County Hosp. Auth., Inc. v. Bowen,* 856 F.2d 668, 670 (4th Cir.1988). The majority also cites *Portland Adventist Medical Center v. Heckler,* 561 F.Supp. 1092, 1096–97 (D.D.C. 1983), in connection with the assertion that the present facts show an attempt to shift costs from Adventist to Hinsdale.

It is true that *Monongahela Valley, Forsyth County* and *Marymount Hosp. v. Shalala,* 19 F.3d 658 (D.C.Cir.1994), implicitly support the proposition that investment income earned by a non-provider parent entity on funds donated by a provider should offset the provider's otherwise allowable interest expense. However, although the Secretary urges that *Portland Adventist* and *Marymount Hospital v. Shalala* (and other imputed investment income offset cases) should control the outcome here, the present case is crucially different from the others:

1. The funds "diverted" in all the cases cited by the Secretary and the majority were diverted to separate corporations that *did not participate in the Medicare program* in order to capitalize other corporations that did not participate in Medicare. For example, in *Portland Adventist,* the funds were transferred from a provider corporation to a corporation that was engaged in a non-reimbursable activity of establishing ambulatory care businesses. Here, on the other hand, the recipient of the funds was a hospital providing hospital care to Medicare patients.

2. Hinsdale in all probability saved Medicare money by using internally generated funds while Hinsdale and Glendale Heights were under the same corporate umbrella.

---

patients (including Medicare patients) in Glendale Heights, who were at risk of loss of care. At the time the funds were transferred, Hinsdale was responsible for Glendale Heights' patient care. Hence, the funds were properly advanced by Hinsdale. After Glendale Heights' "default," the Secretary had an obligation to share in the

interest cost of replacement funds. This is not a "guaranty," as generally understood, since loss of *principal* was not underwritten. And, in any event, there was no "benefit" to Adventist unless Adventist were under some obligation to advance working capital funds in the first place.

3. As the religious order exception of § 413.153(c)(2) suggests, there is no evil in a religious health care system using a strong operating unit to subsidize a weaker one where both are serving patients as Medicare providers.

If there are such evils, neither the Secretary nor the majority has articulated them. It seems to me that the focus on the "intent" of Hinsdale in carrying out this work of mercy merely obfuscates the facts as correctly discerned by Member Sloan in his Review Board dissent.

I therefore respectfully dissent.